REDACTED VERSION

## UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

**Wave Digital Assets, LLC**

       Plaintiff,

**v.**

No. _____

**The United States of America**,

       Defendant.

Judge _____

### **COMPLAINT**

#### **Nature of the case**

1.      This is an action under the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3784 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b)), for declaratory and other appropriate relief relating to the U.S. Department of Justice, United States Marshals Service's ("USMS") breach of federal regulations and proposal evaluation errors in relation to RFP No. 15M50024QA4400003.

#### **Jurisdiction, Venue, and Standing**

2.      Jurisdiction and venue in this Court are proper under the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996. 28 U.S.C. § 1491(b).

3.      Under the Tucker Act, this Court has the "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b).

1

4.      This complaint concerns a protest of the evaluation and award decision of the U.S. Department of Justice, United States Marshals Service ("USMS" or "Agency") concerning RFP 15M50024QA4400003 (the "Solicitation").

5.      Wave Digital Assets, LLC ("Wave") is an interested party because it is an actual offeror for the Solicitation whose direct economic interest would be impacted by the failure to award it.

6.      Wave experienced prejudice because, but for the Agency's evaluation flaws and subsequent incorrect award decision, Wave had a substantial chance of receiving an award. As discussed below, Wave offered competitive pricing and should have been found acceptable and well-rated and, had evaluations been properly conducted and in light of numerous positive aspects of its proposal, would have received a technical evaluation that placed it in line for award. But for the Agency's erroneous evaluation, Wave would have received award.

**Parties**

7.      Wave is a limited liability company organized and existing under the laws of the State of California with headquarters offices located in Los Angeles, CA. It is a small business operating under North American Industry Classification System ("NAICS") code 523910, corresponding $47 million size standard.

8.      Defendant is the United States of America acting through the Department of Justice, United States Marshals Service.

**Prior Lawsuits**

9.      Wave protested the Solicitation at the Government Accountability Office ("GAO") under B-423217; B-423217.2 and GAO denied the earlier protest on March 14, 2025.

2

**Statement of the Claim**

10.    USMS issued the Solicitation on April 5, 2024. See generally Solicitation.

11.    The Solicitation was a 100% small business set-aside under NAICS code 523160 with a corresponding $47 million size standard. See id. at 1.

12.    Per the Performance of Work Statement ("PWS"), the awardee would provide "the full range of cryptocurrency custody, management, disposal, and consulting services" in line with industry standards. See Solicitation Attachment 6 at 3.

13.    The Solicitation covered classes 2-4 of various types of cryptocurrency, which USMS described as being "assets are less popular and typically require the use of software, and/or hardware wallets." Id.

14.    These services include activities such as "accounting, customer management, audit compliance, wallet creation and management, private encryption key generation and management, backup, and recovery of private encryption key material." Id.

15.    Section 2.4.2 of the PWS stated:

2.4.2 Exchange into More Liquid Cryptocurrency Class 2 and Class 4 cryptocurrencies include assets that are not supported by most exchanges. In these situations, the Contractor shall provide a plan to exchange the cryptocurrency for a cryptocurrency that is supported by the Contractor's exchange platform. After completing the exchange, the Contractor shall provide documentation that details the type, amount, and value of cryptocurrency received. The Contractor shall ensure documentation of any fees assessed for the exchange is provided and comes directly from the platform used.

Id. at 11.

16.    The Solicitation included a separate document providing evaluation factors for award. See generally Proposal Evaluation Criteria, Solicitation Attachment 4.

17.    The award under the Solicitation would be a Firm Fixed Price ("FFP") Indefinite Delivery Indefinite Quantity ("IDIQ") Award. Id. at 1.

18.     The criteria noted that the award decision would be based on the offeror "whose proposal conforming to the solicitation" would "be most advantageous to the government based on four evaluation factors." Id. at 1.

19.     These factors were: Factor 1, Experience (Oral Presentation); Factor 2, Technical Capability/Resumes; Factor 3, Other Data; and Factor 4, Price. Id.

20.     This would be a two-phased evaluation. See id. at 2-5.

21.     Phase 1 required Offerors to submit oral presentations for Factor 1, Experience. Id. at 2.

22.     In Phase 2, the Offerors were required to submit a written submission for Factors 2-4. Id. at 3-5.

23.     For the oral presentation, Offerors were required to address a list of prepared questions and topics, a demonstration of the Offeror's understanding and capability to provide a solution for the requirements stated in the PWS, and on-the-spot challenge questions. See Solicitation Attachment 3 at 4-5.

24.     One of these requests stated: "Describe how your system ensures compliance with regulations and laws related to the selling of cryptocurrency assets." Id. at 7.

25.     For Phase II, Factor 2 contained six subfactors: 1) Facility and Staffing, 2) Security, 3) Initial Intake, 4) Storage and Management, 5) Disposal, and 6) Resumes. Solicitation Attachment 4 at 3-4.

26.     Offerors were also required to submit a mitigation plan if a potential OCI existed in accordance with FAR Subpart 9.5. See Solicitation Attachment 3 at 12.

27.     Factors 3 and 4 were, in essence, pass-fail factors. See Solicitation Attachment 4 at 2, 4-5.

28.     USMS would assign confidence ratings when evaluating Factors 1 and 2. Id. at 2.

29.     These confidence ratings were "High Confidence," "Some Confidence," and "Low Confidence." Id. at 2.

30.     The criteria provided that USMS would consider the Offeror's proposed approaches as well as the risks associated with the approaches. Id.

31.     USMS would then arrive at a confidence assessment of the likelihood of the Offeror successfully performing the work and meeting the required objectives. Id.

32.     The Solicitation further stated that any eligible contractor would be required to perform in "accordance with all Federal, State, and local laws and regulations applicable to the services being provided as well as any policies as specified by the USMS. The Contractor shall obtain and keep current throughout the duration of the contract all licenses, insurance policies, permits, and related documents common within the industry and necessary as established by any regulations to operate this type of business." Solicitation Attachment 6 (PWS) at 23-24.

33.     In a set of Q&As, an offeror asked, "Once Class 3-4 cryptocurrency are approved for transfer to Custody, what if they need to be swapped prior, due to there being no support for it in wallet storage or on crypto exchanges,…can it be swapped first?" Solicitation Attachment 8, April 17, 2024.

34.     USMS responded: "Per PWS section 2.1 Custody, the Contractor shall remain capable of taking custody, and managing, all types and quantities of cryptocurrency, described as Class 2-4 without limitation, throughout the performance of this contract. Class 2-4 assets may not be swapped until an authorization document has been received." Id.

35.     Wave timely submitted its initial Proposal, which was due on May 7, 2024. Solicitation at 1.

36.     Wave gave its oral presentation to USMS on May 7, 2024.

37.     On May 14, 2024, Wave was notified of its advancement to Phase 2 and that it received a "High Confidence" rating for Factor 1, Experience – Oral Presentation. Phase 1 Notice of Down Select, Exhibit 1.

38.     This notice did not note any issues that USMS may have had with Wave's proposal. See id.

39.     The notice further provided that Phase 2 submittals were due May 22, 2024. Id.

40.     Wave timely submitted its Phase 2 proposal.

41.     In Wave's Phase 2 proposal, it stated, for Factor 2:



Wave Factor 2 Submission, Exhibit 2 at 20 (emphasis in original).

42.     For Factor 3, Wave's proposal stated, with regards to PWS Section 1.4:



Wave Factor 3 Submission, Exhibit 3 at 50-51.

43.    On or about June 26, 2024, USMS sent a set of discussion questions to Wave regarding its Phase 2 proposal. See June 30, 2024, Wave Response, Exhibit 4.

44.    At no point in these discussion questions did USMS raise any concern or suggest there was a problem with Wave regarding the swapping of unsupported assets by Wave's proposed subcontractor, ████, despite asking about situations involving unsupported assets. See generally id.

45.    USMS asked expressly, "What swapping mechanisms are available for assets not supported by the popular exchanges?" Id. at 13.

46.    In its response to the June 26, 2024, questions, Wave expressly noted its intention to swap assets that are unsupported by ████ upon receipt. See id. at 5.

47.    On September 6, 2024, USMS sent additional follow-up questions to Wave regarding its proposal. See September 6, 2024, USMS Questions, Exhibit 5.

48.    At no point in these discussion questions did USMS raise any concern or issue with Wave regarding the supporting of assets by Wave's proposed subcontractor, ████. See generally id.

49.    On October 24, 2024, at 12:42 PM, Wave received an email from Eliana York with USMS. See October 24, 2024, Email from Eliana York to Wave, Exhibit 6.

50.    In this email, USMS first raised its apparent concern about the swapping of unsupported assets. See id.

51.    In the email, USMS stated that the swapping of cryptocurrency assets was "not a viable solution because the PWS does not permit swapping of assets prior to disposal. Do you have an alternative solution?" Id. at 1.

7

52.     USMS gave Wave a deadline of October 25, 2024, at 5:00 PM ET to provide this alternative solution. Id.

53.     Wave responded that ▮▮▮▮ would be able to support all cryptocurrencies in question by the time performance began. See October 25, 2024, Wave Response, Exhibit 7.

54.     In particular, Wave stated: ▮▮▮▮▮s platform will support all assets, and there is no need for the swapping of assets prior to disposal or otherwise in order to meet the requirements outlined in the PWS." Id.

55.     On October 29, 2024, Wave was notified that Command Services & Support, Inc. ("CMDSS") was the awardee. See Award Notice, Exhibit 8.

56.     On November 1, 2024, Wave submitted additional questions to USMS. See Debriefing, Exhibit 9.

57.     Question 5 asked "Were there any concerns with the Exceptions / Deviations / Conditional Assumptions made by Wave in its proposal? If so, what were they?" Id. at 2.

58.     A post-award debriefing was provided to Wave on November 1, 2024. See id.

59.     In this debriefing, USMS responded to Wave's questions. Id.

60.     In response to Question 5, USMS stated: "No concerns were identified." Id.at 2.

61.     Wave's portion of the Technical Evaluation Board's report was included with this debriefing. See Wave TEB Report, Exhibit 10.

62.     USMS apparently assigned Wave an overall confidence rating of "Low Confidence." Id. at 25.

63.     USMS's reasoning for this rating was that

Wave's plan for custody was to swap assets that were not supported by their custodian for a cryptocurrency that is or liquidate for fiat. After disclosing this was not a viable resolution as previously indicated, Wave did not provide details of an

alternate solution; only a conclusory statement that their custodian ▮▮▮▮ could support all cryptocurrency assets categorized as Class 2-4.

Id.

64.     USMS stated: "Overall, Wave offers a solution that does not work without major revisions to meet the requirements of the PWS. Their proposal lacks details of a sufficient plan for cryptocurrency assets that are not traditionally supported by platforms like ▮▮▮▮ without some form of manipulation." Id. at 24.

65.     This resulted in Wave being ranked below CMDSS and ▮▮▮▮ for this procurement.

Id.

66.     Wave filed an agency-level protest with USMS on November 8, 2024. See November 8, 2024, Agency-Level Protest, Exhibit 11.

67.     During the week of November 17, 2024, Wave learned that CMDSS included ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as a subcontractor on its team for the Solicitation. See November 21, 2024, Agency-Level Protest, Exhibit 12 at 1.

68.     ▮▮▮ ▮▮▮▮ ▮▮▮▮ ▮▮ ▮▮ ▮▮▮ ▮▮▮▮ ▮▮▮▮ ▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮. Id.

69.     Until from 2013 until October 2022, ▮▮▮▮ was employed with USMS. Id.

70.     Specifically, ▮▮▮▮ was the Assistant Chief to the USMS Asset Forfeiture Division Complex Assets Unit, the exact division of USMS seeking services under the Solicitation, from June 2018 until September 2022. See ▮▮▮▮ LinkedIn, Exhibit 13.

71.  See

OCI Memo, Exhibit 14.[1]

72. ███████████████████████████████████████

████████████████████████ See LinkedIn, ████████████ Exhibit 15.

73. ██████ was employed with USMS from May 1997 until July 2022. See id.

74. ███████████████████████████████████████

█████████████████████ See Ex. 14 at 1.

75. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████ Id.

76. Wave filed another agency-level protest with USMS regarding the organizational conflict of interest involving Summers on November 21, 2024. See Ex. 12.

77. USMS denied both agency-level protests on November 26, 2024. See Agency Protest Denial, Exhibit 16.

78. Wave filed a subsequent GAO protest, which was also denied.

79. The Agency also prepared a TEB report for ██████ proposal. See ██████ TEB Report, Exhibit 17.[2]

80. The ██████ TEB Report states under Subfactor 3 of Factor 2, "Initial Intake," that: "For some of the Class 4 crypto assets that are not supported, ██████ would have a collaborative

---

[1] This information is subject to protection under the GAO bid protest protective order that was entered in GAO bid protest under B-423217; B-423217.2, and Wave requests that this court issue its own protective order to cover any GAO protected material.

[2] ██████ voluntarily provided this report to Wave during the course of the aforementioned GAO protest and it was not provided by USMS.

discussion with USMS about the extent of support needed to safely custody these low-value assets." Id. at 16.

81.    The ▆▆ TEB Report further states ▆▆ does not provide a detailed proposal on how they will handle unsupported assets, just that they can." Id.

82.    The ▆▆ TEB Report notes that discussions did occur between the Agency and ▆▆ after the proposal. Id.

83.    Apparently during these discussions, ▆▆ engineering group concluded they can provide cold storage by default intake and storage of all Class 2-4 assets as provided." Id.

84.    Nothing further was addressed regarding the above statements in ▆▆ TEB Report. Id.

85.    ▆▆ received a rating of "Some Confidence" for Subfactor 3 of Factor 2. See id. at 17.

86.    ▆▆ further received a rating of "Some Confidence" overall for Factor 2. See id. at 24.[3]

## Count I
## USMS Deviated from the Solicitation Terms

87.    Section 2.4.2 of the Performance Work Statement expressly states that, as Class 2 and 4 cryptocurrencies are not supported by most exchanges, the offeror must provide a plan to

---

[3] This Protest comes against the backdrop of the Audit of the United States Marshals Service's Management of Seized Cryptocurrency. Report 22-082 (June 2022), Exhibit 18. That report noted that "current USMS seized cryptocurrency management policies related to asset storage, quantification, valuation, and disposal are inadequate or absent, and in some instances provide conflicting guidance. The USMS is actively seeking to outsource the management of seized cryptocurrency. However, without properly documented policies and procedures, the USMS lacks an adequate foundation for building performance requirements for a cryptocurrency services contract." Id.

exchange the unsupported cryptocurrency for one that is supported by the Contractor's exchange platform.

88.     This language was part of the Solicitation even after the various Q & A sessions.

89.     Wave prepared a proposal that provided for a plan to swap said unsupported cryptocurrencies with supported cryptocurrencies as expressly ordered by the Solicitation.

90.     Despite Wave clearly being not just permitted but commanded by the Solicitation to include such a plan, USMS gave Wave's proposal a "Low Confidence" rating precisely because it proposed a plan where it would swap unsupported cryptocurrencies with supported cryptocurrencies.

91.     USMS's deviation from the terms of the Solicitation is the sole reason why Wave got a "Low Confidence" rating for this procurement.

92.     Considering Wave was lower priced than CMDSS and would have had a roughly equivalent rating, this would likely have resulted in award to Wave.

**Count II**
**USMS Engaged in Misleading Discussions and Failed to Give Wave a Reasonable Time to Respond to Discussions**

93.     Wave incorporates by reference and re-alleges the foregoing paragraphs as if fully set out herein.

94.     Where an agency conducts discussions, those discussions must be meaningful and not misleading.

95.     To be meaningful, discussions must advise offerors of material proposal deficiencies and provide offerors a reasonable opportunity to address those areas of weakness which could have a competitive impact.

96.     USMS engaged in discussions with Wave on three separate occasions.

12

97. On the first occasion, on June 26, 2024, USMS addressed the matter of unsupported assets but gave no indication that Wave's proposed swapping plan was non-viable.

98. This gave Wave the impression that its swapping plan was acceptable to the government.

99. Further, to the extent that USMS might assert that it did not know of Wave's swapping plan, Wave expressed such plan to USMS in its responses to the June 26, 2024, discussions.

100. On the second occasion, on September 9, 2024, USMS asked about Wave's fee structuring, making no mention of any issue with swapping or unsupported assets.

101. On the third and final occasion, USMS finally raised the swapping issue with Wave on October 24, 2024, five days before it announced award to CMDSS.

102. In this last set of discussions, USMS only gave Wave one day to provide an alternative solution to the swapping plan.

103. This is a completely unreasonable amount of time considering the complexity of this procurement.

104. USMS could have raised this issue with Wave five months earlier than it did, but never did so.

105. USMS' first two sets of discussions were misleading, and while its last set of discussions actually addressed what was eventually the sole reason Wave received a "Low Confidence" rating, USMS gave Wave essentially no time to meaningfully and fully respond, rendering such discussions meaningless.

13

106.    Had USMS engaged in meaningful discussions, Wave would have had sufficient time to show how it is able to support the cryptocurrencies in question, which would have resulted in Wave receiving a rating of at least "Some Confidence."

107.    Considering Wave was lower priced than CMDSS and would have had a roughly equivalent rating, this would likely have resulted in award to Wave.

### Count III
### USMS Unequally Treated Wave and ███████ Proposals

108.    Wave incorporates by reference and re-alleges the foregoing paragraphs as if fully set out herein.

109.    Where an agency downgrades a proposal for claimed deficiencies that are substantively indistinguishable or nearly identical from those contained in other proposals, and does not downgrade those other proposals, such is a disparate evaluation.

110.    Disparate evaluations are unreasonable and lack a rational basis.

111.    USMS assigned Wave a "Low Confidence" rating for Factor 2 and overall.

112.    USMS assigned Wave this rating specifically for not being able to support certain assets and then not providing details on how Wave's subcontractor would support said assets when queried.

113.    The ████ TEB Report stated ██████ does not provide a detailed proposal on how they will handle unsupported assets, just that they can."

114.    Despite ██████ proposal having the same alleged issue as Wave that resulted in Wave receiving a "Low Confidence" rating, ████ received a "Some Confidence" rating overall.

115.    Had Wave's proposal been treated the same as ███████ Wave would have received a "Some Confidence" rating for Factor 2 and overall.

116.    Had Wave received a "Some Confidence" rating for the procurement, considering it offered a cheaper price than CMDSS and had no other issues, Wave would have likely received award.

117.    USMS' disparate treatment of Wave's proposal directly resulted in prejudice to Wave.

## Count IV
### USMS's Evaluation is Self-Contradictory

118.    Wave incorporates by reference and re-alleges the foregoing paragraphs as if fully set out herein.

119.    It is a fundamental principle of federal procurement that an agency's evaluation of an offeror's proposal must be consistent and reasonable.

120.    Contracting agencies may not contradict themselves in their evaluations.

121.    USMS stated that the basis for its "Low Confidence" rating for Wave was Wave's plan to swap unsupported assets/inability to show it can support unsupported assets.

122.    Wave described such plan in the Factor 3 portion of its proposal, yet USMS found no issue with such alleged deviation.

123.    Such a finding is self-contradictory and calls into question the reasonableness of USMS' evaluation.

## Count V
### USMS Deviated from Stated Evaluation Criteria Regarding Licensing

124.    Wave incorporates by reference and re-alleges the foregoing paragraphs as if fully set out herein.

125.    It is a fundamental principle of federal procurement that agencies must review and evaluate offerors' proposals reasonably in accordance with the underlying solicitation.

126.    Contracting agencies do not have the discretion to announce in the solicitation that they will use one evaluation plan, and then follow another.

127.    Once offerors are informed of the criteria against which the proposals will be evaluated, the agency must adhere to those criteria in evaluating proposals and making its award decision, or inform all offerors of any significant changes made in the evaluation scheme.

128.    For the oral presentation portion of the procurement, the Solicitation observes that offerors "must address the following" item: "Describe how your system ensures compliance with regulations and laws related to the selling of cryptocurrency assets."

129.    The PWS, in turn, notes that "the Contractor shall obtain and keep current throughout the duration of the contract all licenses, insurance policies, permits, and related documents common within the industry and necessary as established by any regulations to operate this type of business."

130.    The Agency, in its response to the agency-level protest, incorrectly stated that "the Solicitation does not state that the Agency would evaluate whether an Offeror has all applicable licenses and registrations to perform the contract."

131.    This procurement involves the management of cryptocurrency assets.

132.    Many cryptocurrencies, including many cryptocurrencies in Classes 2-4, are securities under established Securities and Exchange Commission ("SEC") guidance and case law.

133.    It is unlawful for an investment adviser to receive compensation for managing securities on behalf of others without obtaining the appropriate SEC licensure.

134.    As such, the Agency necessarily was seeking appropriate SEC licensure.

135.    Further, any party that engages in effecting transactions in securities for the account of others is a broker that must be registered with the SEC.

136.    Neither CMDSS nor ▮▮▮ had the required federal or state licenses to perform the Contract during the proposal stage, nor could they reasonably acquire the required federal or state licenses in time for the start of contract performance.

137.    Despite the Solicitation requiring offerors to show how their proposed system will comply with applicable laws, the Agency failed to find CMDSS and ▮▮▮ ineligible for award despite their lack of licensing/ability to obtain said licensing in time to perform the contract.

138.    Had the Agency properly found both CMDSS and ▮▮▮ ineligible, all other offerors would be eliminated, and considering that Wave was improperly given a "Low Confidence" rating, the reversal of such errors would result in award to Wave even if CMDSS should otherwise have a superior proposal.

### Count VI
**USMS Failed to Consider a Crucial Conflict of Interest with Regards to CMDSS' Proposal**

139.    Wave incorporates by reference and re-alleges the foregoing paragraphs as if fully set out herein.

140.    Contracting officials must avoid, neutralize, or mitigate potential conflicts of interest to prevent unfair competitive advantage.

141.    Where an offeror employs a former government official, an agency should eliminate an offeror from a procurement based on the mere appearance of impropriety.

142.    The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships.

143.    During the course of the procurement, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ a subcontractor to CMDSS.

144.    Prior to this, ▮▮▮▮▮ was the Assistant Chief for the USMS Asset Forfeiture Division Complex Asset Unit – the same entity seeking services under this Solicitation.

17

145.  ████████████████████████████████████████████████████

████████████████████████████[4]

146.  ████████ prior employment provided CMDSS with unequal and improper access to nonpublic, competitively useful information about the procurement, USMS's preference, and the competition that aided CMDSS in preparing its proposal.

147.  Additionally, during the course of the procurement, ████████ was the ████████

████████████████████████████████████████.

148.  ████████████████████████████████████████████████████

████████████████████████[5]

149.  ████████ prior employment provided CMDSS with unequal and improper access to nonpublic, competitively useful information about the procurement.

150.  The role of prominent USMS officials with nonpublic information led to an organizational conflict of interest that could not be mitigated by CMDSS.

151.  There is no indication USMS properly investigated and documented its investigation to the extent it performed one.

152.  This renders the award to CMDSS improper.

**Relief requested**

For the foregoing reasons, Wave requests judgment in its favor and an order from this Court granting the following relief:

a)  An order directing USMS to award a contract under the Solicitation to Wave;

---

[4] This information is subject to protection under the GAO bid protest protective order that was entered in GAO bid protest under B-423217; B-423217.2, and Wave requests that this court issue its own protective order to cover any GAO protected material.

[5] See Footnote 3.

b)  Alternatively, an order directing USMS to reevaluate proposals in accordance with the

terms of the Solicitation; and

c)  Any other relief that this Court deems appropriate, including, but not limited to, an

award of Wave's attorneys' fees and costs.

Dated: May 30, 2025                              Respectfully submitted,

*Of counsel*                                     s/ Shane J. McCall
Nicole D. Pottroff                               Shane J. McCall
John L. Holtz                                    KOPRINCE MCCALL POTTROFF LLC
Gregory P. Weber                                 901 Kentucky Street, Ste. 301
Stephanie L. Ellis                               Lawrence, Kansas 66044
Annie E. Birney                                  Telephone: (785) 200-8919
KOPRINCE MCCALL                                  *smccall@koprince.com*
POTTROFF LLC

                                                 *Counsel for Wave Digital Assets, LLC*

19

## Certificate of Service

I certify that a true and correct copy of this Complaint was provided to the Clerk of Court via the CM/ECF system, for service on the United States and under Rule 4, on May 30, 2025. In addition, I emailed a courtesy copy of this Complaint to counsel for the government.

Department of Justice
Albert S. Iarossi, Esq. (Albert.S.Iarossi@usdoj.gov)


s/ Shane J. McCall
Shane J. McCall


*Counsel for Wave Digital Assets, LLC*