# UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

**Wave Digital Assets, LLC**

Plaintiff,

**v.**

**The United States of America**,

Defendant.

and

**Command Services & Support, Inc.,**

Defendant-Intervenor.

|  Redacted Version  |

No. 25-cv-00928

█████████████

███████████████████

██████████████

Judge David A. Tapp

---

## WAVE DIGITAL SERVICES, LLC'S MEMORANDUM OF FACTS AND LAW IN SUPPORT OF IN SUPPORT OF THE MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD IN FAVOR OF PLAINTIFF

For the reasons stated in this Memorandum, Wave Digital Services, LLC's ("Wave") Motion for Judgment on the Administrative Record in favor of Wave should be granted. Specifically, Wave requests the Court order the United States (acting through the U.S. Department of Justice, United States Marshals Service ("USMS") to terminate Contract No. 15M50025DA4400001 (the "Contract") awarded to Command Services & Support, Inc. ("CMDSS") for the performance of work contemplated under RFP No. 15M50024QA4400003 (the "Solicitation"), and either award a contract to Wave, reenter discussions with the offerors under the Solicitation, and/or reevaluate proposals, or any other relief this Court sees fit for this matter.

Dated: September 9, 2025

*Of counsel:*

Nicole D. Pottroff
John L. Holtz
Gregory P. Weber
Stephanie L. Ellis
Annie E. Birney

KOPRINCE MCCALL POTTROFF LLC

Respectfully Submitted,

/s/ Shane J. McCall
Shane J. McCall
KOPRINCE MCCALL POTTROFF LLC
901 Kentucky Street, Suite 301
Lawrence, KS 66044
(785) 200-8919
*smccall@koprince.com*

*Counsel for Wave Digital Services, LLC*

████████████████████████████████████

██████████████

**Table of Contents**

TABLE OF AUTHORITIES ......................................................................................... 4

INTRODUCTION........................................................................................................ 6

QUESTIONS PRESENTED ........................................................................................ 6

STATEMENT OF THE CASE .................................................................................... 7

    A.    The Solicitation.............................................................................................. 7

    B.    Wave's Proposal. .......................................................................................... 9

    C.    Discussions. ..................................................................................................10

    D.    Award Notice and Debriefing. .....................................................................11

    E.    ████ Proposal and Discussions. ...............................................................14

    F.    ████ TEB Report. .......................................................................................16

JURISDICTION, STANDING, AND PREJUDICE.....................................................16

STANDARD OF REVIEW .........................................................................................17

ARGUMENT ...............................................................................................................18

    A.    USMS Engaged in Misleading Discussions and then Failed to Give Wave Sufficient Time to Respond to Discussions. ................................................................18

        1. USMS' Discussions Misled Wave. ..........................................................20

        2. USMS Did Not Give Wave a Meaningful Opportunity to Respond to its Final Discussion Request...........................................................................................23

        3. Wave was Prejudiced by the Misleading Discussions and the Failure of USMS to Give Wave a Meaningful Opportunity to Respond. ..........................................27

    B.    USMS Engaged in Disparate Treatment of Wave and ████'s Proposals.................29

    C.    USMS Arbitrarily Lowered Wave's Factor 1 Rating..........................................34

    D.    USMS Deviated from Evaluation Criteria regarding Licensing. .........................37

    E.    USMS Failed to Properly Evaluate an Organizational Conflict of Interest............39

CONCLUSION AND RELIEF REQUESTED ............................................................42

**Table of Authorities**

**Cases**

Advanced Tech. Sys. Co. v. United States, No. 25-515, 2025 WL 1984372 (Fed. Cl. 2025) ..... 33

Aetna Gov't Health Plans, Inc., B–254397 (Comp. Gen. Jul. 27, 1995) ..................................... 39

Agile Def., Inc. v. United States, 143 Fed. Cl. 10 (2019).............................................................. 19

Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320 (Fed. Cir. 2011)..................................... 23

AM Gen., LLC v. United States, 115 Fed. Cl. 653 (2014) ............................................................ 18

Analytical & Rsch. Tech., Inc. v. United States, 39 Fed. Cl. 34 (1997)........................................ 18

AshBritt, Inc. v. United States, 87 Fed. Cl. 344 (2009)................................................................ 19

Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377 (2003).................................. 19, 33

Bannum, Inc. v. United States, 404 F. 3d 1346 (Fed. Cir. 2005) ................................................. 17

BCPeabody Construction Services, Inc. v. United States, 112 Fed. Cl. 502 (2013) .................... 17

C.A.C.I., Inc. v. United States, 719 F.2d 1567 (Fed. Cir. 1983) .................................................. 39

CACI Field Servs., Inc. v. United States, 13 Cl. Ct. 718 (1987) .................................................. 24

Centech Grp., Inc. V. United States, 554 F. 3d 1029 (Fed. Cir. 2009)......................................... 43

Centerra Grp., LLC v. United States, 138 Fed. Cl. 407 (2018) ...............................................28-29

Centerra Sec. Servs. GmbH v. United States, 176 Fed. Cl. 219 (2025) ....................................... 34

Constellation W., Inc. v. United States, 125 Fed. Cl. 505 (2015) ................................................ 33

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23 (2011) ............................................... 19

Dynacs Eng'g Co. v. United States, 48 Fed. Cl. 614 (2001)......................................................... 28

Ekagra Partners, LLC v. United States, 170 Fed. Cl. 1 (2024)..................................................... 29

FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359 (2011) ........................................ 37

Greenland Contractors I/S v. United States, 131 Fed. Cl. 216 (2017).......................................... 19

L-3 Commc'ns Integrated Sys., L.P. v. United States, 98 Fed. Cl. 45 (2011) .............................. 34

Lucent Techs. World Servs., Inc., 13–295462 (Comp. Gen. Mar. 2, 2005)................................. 39

McVey Co., Inc. v. United States, 111 Fed. Cl. 387 (2013).......................................................... 39

Off. Design Grp. v. United States, 951 F.3d 1366 (Fed. Cir. 2020) ............................................. 29

NKF Eng'g, Inc. v. United States, 805 F.2d 372 (Fed. Cir.1986).................................................. 39

People, Tech. & Processes, LLC v. United States, 151 Fed. Cl. 713 (2020)................................. 37

Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan, 662 F.2d 641 (9th Cir. 1981) 23-24

Raytheon Co. v. United States, 170 Fed. Cl. 561 (2024).........................................................40-41

RBVETCO, LLC v. United States, 172 Fed. Cl. 566 (2024) ........................................................ 23

Remington Arms Co., LLC v. United States, 126 Fed. Cl. 218 (2016)......................................... 43

Red River Computer Co. v. United States, 120 Fed. Cl. 227 (2015)............................................. 29

Res Rei Dev., Inc. v. United States, 126 Fed. Cl. 535 (2016) ..................................................34-35

Sec. & Exch. Comm'n v. Coinbase, Inc., 726 F. Supp. 3d 260 (S.D.N.Y. 2024)........................ 37

Sentrillion Corp. v. United States, 114 Fed. Cl. 557 (2014).................................................... 19, 23

Space Age Eng'g, Inc. v. United States, 4 Cl. Ct. 739 (1984) ..................................................... 41

State v. United States, 134 Fed. Cl. 8 (2017)......................................... 37

SupplyCore Inc. v. United States, 132 Fed. Cl. 480 (2017) ......................................... 17

Tech. Innovation All. LLC v. United States, 149 Fed. Cl. 105 (2020).......................................... 34

Timken U.S. Corp. v. United States, 421 F.3d 1350 (Fed. Cir. 2005).......................................... 34

Trace Sys. Inc. v. United States, 165 Fed. Cl. 44 (2023)................................................ 41

Turner Const. Co. v. United States, 94 Fed. Cl. 561 (2010)........................................... 39

Turner Const. Co. v. United States, 645 F.3d 1377 (Fed. Cir. 2011) ........................................... 42

WellPoint Mil. Care Corp. v. United States, 953 F. 3d 1373 (Fed. Cir. 2020)............................ 17

UnitedHealth Mil. & Veterans Servs., LLC v. United States, 132 Fed. Cl. 529 (2017).............. 13

**Statutes**

15 U.S.C. § 80b-2 .......................................................................................... 38

15 U.S.C. § 80b-3 .......................................................................................... 38

18 U.S.C. § 207................................................................................ 39-40, 42

28 U.S.C. § 1491.............................................................................. 16-17, 43

**Regulations**

FAR 1.602-2 .................................................................................................. 29

FAR 9.504....................................................................................................... 39, 42

FAR 15.306.................................................................................................... 18-21

████████████████████████████████████████

████████████████

**Introduction[1]**

Agencies must act reasonably when evaluating offers under a competitive procurement. Despite this fact, USMS made numerous errors in its evaluation of offers under the Solicitation. It failed to give Wave a meaningful opportunity to respond to discussions, unequally evaluated proposals, arbitrarily downgraded Wave's proposal, failed to evaluate in accordance with the stated evaluation criteria, and further overlooked a serious concern regarding an organizational conflict of interest ("OCI"). These errors prejudiced Wave, resulting USMS awarding the Contract for the Solicitation to CMDSS.

Thus, this protest is concerned with preventing an unreasonable award to CMDSS, which is an unlicensed, conflicted, and inexperienced vendor. Award to CMDSS repeats errors that USMS has made before, as documented in the 2022 Audit of the United States Marshals Service's Management of Seized Cryptocurrency. ECF 1, Ex. 18. CMDSS lacks experience with securities and liquidation at scale. Wave, in contrast, is an SEC-registered investment adviser with institutional custodians on its team and experience in real-world, court-supervised liquidations (e.g. liquidations under the FTX bankruptcy totaling $200 million and many others).[2]

**Questions Presented**

1.      Did USMS mislead Wave as to what USMS later felt was the key issue with Wave's proposal and then fail to give Wave a meaningful opportunity to respond to this when it finally raised the issue at the last minute?

---

[1] Page count in accordance with COFC rules begins here.

[2] "You don't stand for something, you fall for anything." Harder Than You Think, Public Enemy, How You Sell Soul to a Soulless People Who Sold Their Soul (2007).

██████████████████████████████████████████████

██████████████████

2.      USMS assigned Wave and ██████████████████ different ratings despite no practical difference between their proposals for Factor 2. Did USMS engage in disparate treatment with regards to Wave and ████'s proposals?

3.      USMS initially assigned Wave a rating of "High Confidence" for Factor 1. However, it then changed this rating to "Some Confidence" without explanation. USMS also ignored its own findings of flaws with the CMDSS proposal. Did USMS engage in an arbitrary and unsupported evaluation?

4.      The Solicitation demanded that offerors show their ability to comply with legal requirements, which would include applicable SEC regulations and securities laws. CMDSS and ████ could not comply with these requirements or show the same. Did USMS fail to evaluate the Solicitation in accordance with stated evaluation criteria?

5.      CMDSS' team included a subcontractor that employed former USMS personnel who actually assisted in preparing the original planned requirements for this Solicitation, yet USMS found no conflict of interest to exist. Did USMS unreasonably find no conflict of interest existed?

### Statement of the Case

**A.      The Solicitation**

USMS issued the Solicitation on April 5, 2024.[3] Per the Performance of Work Statement ("PWS"), the awardee would provide "cryptocurrency custody, management, disposal, and consulting services" in line with industry standards. These services include activities such as "accounting, customer management, audit compliance, wallet creation and management, private

---

[3] For the sake of brevity and accomplishing the aim of the ordered appendix to narrow down the documentation to those documents that are truly relevant, we omit citations for those items that are not a matter of debate or argument in this protest.

encryption key generation and management, backup, and recovery of private encryption key material." The award under the Solicitation would be a Firm Fixed Price ("FFP") Indefinite Delivery Indefinite Quantity (IDIQ) Award. Award decision would be best-value based.

Under the procurement there were four evaluated factors: Factor 1, Experience (Oral Presentation); Factor 2, Technical Capability/Resumes; Factor 3, Other Data; and Factor 4, Price. There would be a two-phased evaluation. Phase 1 required Offerors to submit oral presentations for Factor 1, Experience. In Phase 2, the Offerors were required to submit a written submission for Factors 2-4. For the oral presentation, Offerors were required to address a list of prepared questions and topics. One of these requests stated: "Describe how your system ensures compliance with regulations and laws related to the selling of cryptocurrency assets." AR 134; PA 4.

USMS would assign confidence ratings when evaluating Factors 1 and 2. These confidence ratings were "High Confidence," "Some Confidence," and "Low Confidence." The criteria provided that USMS would consider the Offeror's proposed approaches as well as the risks associated with the approaches. USMS would then arrive at a confidence assessment of the likelihood of the Offeror successfully performing the work and meeting the required objectives. Factors 3 and 4 were, in essence, pass-fail factors.

The PWS contained additional details on what USMS was seeking in terms of work performance under the contemplated contract. In Section 2.1, "Custody," it states: "[T[he Contractor shall remain capable of taking custody, and managing, all types and quantities of cryptocurrency, described as Class 2-4 without limitation, throughout the performance of this contract." AR 152, PA 11. The PWS further stated that any eligible contractor would be required to perform in "accordance with all Federal, State, and local laws and regulations applicable to the services being provided as well as any policies as specified by the USMS. The Contractor shall

8

obtain and keep current throughout the duration of the contract all licenses, insurance policies, permits, and related documents common within the industry and necessary as established by any regulations to operate this type of business." AR 170-71, PA 29-31.

In a set of Q&As that preceded oral presentations, an offeror asked, "Once Class 3-4 cryptocurrency are approved for transfer to Custody, what if they need to be swapped prior, due to there being no support for it in wallet storage or on crypto exchanges,…can it be swapped first?" AR 365, PA 32.[4] USMS responded: "Per PWS section 2.1 Custody, the Contractor shall remain capable of taking custody, and managing, all types and quantities of cryptocurrency, described as Class 2-4 without limitation, throughout the performance of this contract. Class 2-4 assets may not be swapped until an authorization document has been received." Id.

### B.      Wave's Proposal.

Wave gave its oral presentation on May 7, 2024.[5] On May 14, 2024, Wave was notified of its advancement to Phase 2 and that USMS had given Wave a rating of "High Confidence" for Factor 1. AR 843, PA 34. Phase 2 submittals were due May 22, 2024. Id.

In Wave's Phase 2 proposal, it stated, for Factor 2:



---

[4] While the AR Index describes this as being issued in June 2024, after proposal submission, it appears per SAM that the Q&A was issued in April 2024. If this is not the case and the Q&A was issued post-proposal submission, such Q&A should be completely discounted in terms of what information it may or may not have communicated to the offerors, as it was not discussions as it provided no opportunity for revision.

[5] Reviewing the record of this presentation, it does not appear any of the issues raised in this protest were discussed in said presentation by either the Wave team or USMS.

██████████████████████████████████████████

██████████████████

AR 1525, PA 49. As such, the initial plan was to provide custodial hard wallets for all cryptocurrencies not supported by ████.

## C.    Discussions.

On June 26, 2024,[6] USMS began engaging in discussions with Wave, CMDSS, and another offeror, ████. See ECF 35-2 at 7-8.[7] USMS engaged in three sets of discussions with Wave, three sets of discussions with CMDSS, and four sets of discussions with ████. Id. The first discussion set was sent to Wave on June 26, 2024. See AR 1948-64, PA 71-87. In this set, USMS asked in Questions 3, 6, 9, and 12 about various issues with otherwise unsupported assets being stored on hardware wallets. Wave responded that it expected that instead, such assets could be converted into assets supported by ████, "per the PWS and as instructed by USMS." See id. (in particular AR 1952, PA 75). Wave said nothing about liquidating assets prior to receiving authorization from USMS. See id. The second set of USMS discussions with Wave on September 6, 2024, asked: "What is the fee structure associated with liquidating cryptocurrency assets? Are the fees taken directly from the asset? If so, at what percentage rate in basis points." See AR 1966, PA 88. Wave responded that:

> Due to the current regulatory environment and potential treatment of all or certain Class 2-4 assets as "securities" under U.S. law, ██████████████
>

Id. No mention was made by USMS of any issue it may had with Wave with regards to the liquidation of assets. See id. The third set of discussions with Wave, sent on October 24, 2024, stated:

---

[6] The AR Index states the date was June 24, 2024, but the first discussion document, sent to Wave, was dated June 26, 2024.
[7] All citations to the Docket are citations to this Case No. 1:25-cv-00928-DAT except for where otherwise stated.

> Your responses to questions 3, 6, 9, and 12 require the swapping of cryptocurrency assets for types supported by the ██████ platform to meet insurance requirements, SOC requirements, creation of wallet address and notifications of non-supported by ██████'s platform and returns of assets not supported by ██████'s platform. As indicated by PWS sections 1.3 Objective, 2.1 Custody, 2.3.10.1 Use of Government Assets, 2.4.2 Exchange into More Liquidate Crypto and Q&A responses posted on 04/11/2024 and 04/17/2024 (listed below) this is not a viable solution because the PWS does not permit swapping of assets prior to disposal. Do you have an alternative solution?
>
> A response is required NLT Friday, October 25th at 5:00 pm ET.

AR 1969, PA 89. In response to this request that Wave essentially rewrite entire sections of its proposal, Wave responded, "Taking this into account, we confirm that there is no need for an alternative solution. Our subcontractor ██████'s platform will support all assets, and there is no need for the swapping of assets prior to disposal or otherwise in order to meet the requirements outlined in the PWS." AR 1971, PA 90.

### D.      Award Notice and Debriefing.

On October 29, 2024, Wave was notified CMDSS was the awardee. Wave requested a debriefing, which USMS provided. Wave's portion of the Technical Evaluation Board's ("TEB") report was included with this debriefing. See AR 2009-18, 2041-55, 2070; PA 94-103, 115-129, 144.[8] For Factor 1, despite the earlier statement that USMS found a rating of "High Confidence," USMS assigned Wave a rating of "Some Confidence." See AR 2018, PA 103. As for Factor 2, Wave received a rating of "Low Confidence." See AR 2054, PA 128. The report claimed the following as risks or deficiencies with regards to Wave's proposal for Factor 2, after all discussions:

> Wave is proposing a solution where they manage a separately managed entity ████████████████████████████████████ (risk). The proposal also includes the use of ██████ services as a custodian who is limited in the type of

---

[8] Wave observes that the copy of TEB report provided with the Administrative Record for the debriefing at AR Tab 62 is ██████'s TEB report. The TEB report actually provided in the debriefing was a redacted copy of Wave's TEB report. All the same, as Wave's TEB report is provided in AR Tab 45, Wave shall refer to it for the sake of convenience.

cryptocurrencies they can support. During the Q&A phase of the procurement, the USMS explicitly stated that a separately managed entity would not be a viable solution for the USMS, and it was still presented as one.

AR 2041, PA 115.[9]

Risk: In the proposal, the main company states "Wave is exploring commercial crime and cybercrime insurance and can obtain the aforementioned additional coverage if required," though it is required per the PWS. The proposal doesn't provide a holistic approach to insurance, and it is unclear who will file a claim for which events.

AR 2042, PA 116.[10]

Post Discussion Questions Evaluation (1st Round): Wave's response to discussion questions related to the insurance coverage of unsupported assets includes that ████'s custody platform will cover unsupported assets because they will have been (1) converted to a supported asset in an asset swap (2) sold with proceeds returned to USMS or held in stable coins (3) burned. This is not feasible as seized cryptocurrency must remain in the same way they have been seized in until an authorizing document is received. This answer continues to show a deficiency in the proposal for insurance coverage.

AR 2043, PA 117.

Post Discussion Question Evaluation (2nd Round)[11]:
After repeatedly[12] being informed that the swapping and/or converting of cryptocurrency assets to use their identified custodian was not a viable option, Wave indicated that their custodian, ████ would be able to support all cryptocurrency assets, thus being able to provide insurance for all assets. However, Wave failed to provide any details related to how this is possible and how this would change their proposal. Furthermore, the list of supported assets on ████'s website ████████████████ shows they do not support numerous cryptocurrency assets categorized as Class 2-4 (e.g., Bitcoin SV, Ark, VeThor, VeChain, Hashflow). There is low confidence that Wave would be successful, even with government intervention.

---

[9] Wave still received a rating of "Some Confidence" with this risk under Factor 2, Subfactor 1(i), where this risk is located.

[10] This risk was essentially obviated by the discussions that led to Wave's claimed swapping plan.

[11] This was the 3rd round, USMS is ignoring its September 2024 discussions, where it did not raise the swapping issue.

[12] As discussed elsewhere, this stretches the definition of the word "repeatedly." The first time USMS communicated this consideration was in a short response to a Q&A on April 11, 2024, before discussions that essentially modified Wave's proposal. AR 365, PA 32. The second time was October 24, 2024, when USMS gave Wave a single day to provide a new solution for unsupported cryptocurrency assets, despite being aware of the same for months and having a second round of discussions in September 2024.

██████████████████████████████████

AR 2043, 2045, 2047, 2049, 2053; PA 117, 119, 121, 123, 127.[13]

> This proposal does not explain the cold storage methods for assets not supported by ████'s Cold Custody solution although the majority of the assets will not be supported by it.

AR 2049, PA 123.

> The proposal includes Wave setting up a ██████████████████████████ ██████████████████████████ to access offshore liquidity (risk). The PWS requires the use of US based exchanges. Details related to the swapping mechanisms and exchange platforms were provided.

AR 2051, PA 125.[14] [15] USMS assigned Wave an overall confidence rating of "Low Confidence."

AR 2070, PA 144. USMS's reasoning for this rating was that

> Wave's plan for custody was to swap assets that were not supported by their custodian for a cryptocurrency that is or liquidate for fiat. After disclosing this was not a viable resolution as previously indicated, Wave did not provide details of an alternate solution; only a conclusory statement that their custodian ████ could support all cryptocurrency assets categorized as Class 2-4.

Id. This resulted in Wave being ranked below CMDSS and ████ for this procurement. Id.

### E.    Agency and GAO Protests.

Wave filed an agency-level protest with USMS on November 8, 2024. During the week of November 17, 2024, Wave learned CMDSS included ██████████████████████████ as a subcontractor on its team for the Solicitation. See AR 2298-99, PA 146-47. ██████████

---

[13] The analysis from Factor 2, Subfactor 1(iii) was repeated verbatim for Factor 2, Subfactor 2(iii); Factor 2, Subfactor 3(i); Factor 2, Subfactor 4(i); and Factor 2, Subfactor 5(ii). These are also the only sub-subfactors where Wave received a "Low Confidence" rating, indicating this was the sole basis for the Agency's "Low Confidence" rating for Factor 2 and for the proposal overall.

[14] Wave still received a rating of "Some Confidence" with this risk under Factor 2, Subfactor 5(i), where this risk is identified.

[15] Wave does observe that, in USMS' price analysis document, it found Wave's price "too low" and that "the underpricing introduced risks related to service delivery and operational capability, which undermines the attractiveness of its low bid." AR 1995. This is a finding on price realism. See UnitedHealth Mil. & Veterans Servs., LLC v. United States, 132 Fed. Cl. 529, 554 (2017) ("[A] price realism analysis considers whether an offeror's price is too low, such that it indicates a risk of poor performance and a lack of understanding of the solicitation requirements."). The Solicitation does not provide for price realism analysis, and "it is improper for an agency to conduct a price realism analysis in a fixed-price procurement when the solicitation does not expressly or implicitly require a price realism analysis because such an analysis would employ unstated evaluation criteria." Id. at 561.



employs, as its Chief Recovery Officer, ▮▮▮▮▮▮▮▮▮▮▮▮▮. AR 2412, PA 170. From 2013 until October 2022, ▮▮▮▮▮ was employed with USMS. Id. ▮▮▮▮▮ was the Assistant Chief to the USMS Asset Forfeiture Division Complex Assets Unit, the division of USMS seeking services under the Solicitation, from June 2018 until September 2022. Id. As Assistant Chief, ▮▮▮▮▮ created the original requirements to the predecessor to the Solicitation and sat on the TEB for that same predecessor solicitation. See AR 80, PA 1. Further, it appears that ▮▮▮▮▮ actually was involved with "formulating the original requirements for" this Solicitation, including portions of the PWS, prior to her departure from USMS. See AR 2419, PA 171.

▮▮▮▮▮▮▮ also employs, as its Senior Vice President of Government Relations, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮. Previously, ▮▮▮▮▮ was the Assistant Chief Inspector of the International Unit at the USMS' Asset Forfeiture Division. See AR 80, PA 1. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ Id.

Wave filed another agency-level protest with USMS regarding the organizational conflict of interest involving ▮▮▮▮▮ on November 21, 2024. USMS denied both agency-level protests on November 26, 2024. Wave filed a subsequent GAO protest, along with a supplemental protest, which was also denied.

F.  ▮▮▮▮▮ **Proposal and Discussions.**

With regards to ▮▮▮▮▮'s proposal, it stated on its ability to support assets, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14



” AR 1265, PA 35.[16]

After proposals were submitted, ▮▮▮ entered discussions with the agency much like Wave. See

ECF 35-2 at 7. In the first set of discussions, in response to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ responded:

> In our evaluation of the list of Class 2 - 4 assets provided by USMS, Team ▮▮▮'s engineering group concluded that we can provide cold storage by default intake and storage of all the listed Class 2 - 4 assets and transact them as required for later liquidation or return on the listed blockchain(s). We also assessed the relative complexity of full wallet support for each asset, rating each as either "Low", "Moderate" or "High" complexity. Of the 301 assets, 90% are supported today or could be added with rather minimal effort quickly as they are "Low complexity" crypto assets.

AR 1769, PA 58. For "High complexity" assets, ▮▮▮ further explained:

> High complexity: ▮▮▮▮▮ does not currently support a similar asset or blockchain type and will require extensive research and engineering to support. These assets do not have mature codebases, active ecosystems, reliable public node infrastructure, or various open sourced tooling available. Supporting these assets while meeting all of ▮▮▮▮▮'s engineering design principles is at risk of being unlikely and/or requires a high level of custom engineering.

Id. Then, in the fourth apparent set of discussions with ▮▮▮, USMS asked: "What is your time

estimation for accomplishing the SOC 2 Type 2 assessment? This timeline is essential to

understand/gauge the operational start of the performance. Without a SOC 2 Type 2 assessment,

the custody/intake process cannot be undertaken, and the tier/range is $0 with what should be $0

monthly price." AR 1810, PA 63. ▮▮▮ explained as part of its response:

> In evaluating the Class 2 – 4 wallet requirements for cold storage, our team concluded that there are 3 tiers of wallets:
>
> a. Simple: ▮▮▮▮▮ has an engineered solution for this wallet/blockchain. This is about 60 % of the list.

---

[16] Although USMS later describes ▮▮▮'s proposal as asserting ▮▮▮ can support unsupported assets, it is not entirely clear where this statement or an equivalent is.

███████████████████████████

██████████████

    b.  Moderate: ████████ has an engineered solution similar to this wallet/blockchain that could be rapidly tested & deployed but not an exact fit (think a new ERC20 Ethereum token).

    c.  Complex: ████████ has no engineered solution for this novel or esoteric wallet/blockchain combination which will require extensive engineering efforts.

Id.

### G.    ████████ TEB Report

USMS prepared a TEB report for ████'s proposal. See AR 2019-28, 2056-70; PA 104-113, 130-144. The ████ TEB Report states under Subfactor 3 of Factor 2, "Initial Intake," that: "For some of the Class 4 crypto assets that are not supported, ████ would have a collaborative discussion with USMS about the extent of support needed to safely custody these low-value assets." AR 2061, PA 132. The ████ TEB Report further states "████ does not provide a detailed proposal on how they will handle unsupported assets, just that they can." Id. The ████ TEB Report notes that discussions did occur between USMS and ████ after the proposal. Id. Apparently during these discussions, "████'s engineering group concluded they can provide cold storage by default intake and storage of all Class 2-4 assets as provided. New cryptocurrency assets will be assed Low/Medium/High Complexity and USMS will have to determine if it is fiscally worth requesting a supporting mechanism." Id. ████ received a rating of "Some Confidence" for Subfactor 3 of Factor 2. See AR 2062, PA 136. ████ further received a rating of "Some Confidence" overall for Factor 2. See AR 2070, PA 144.

### Jurisdiction, Standing, and Prejudice

Jurisdiction and venue in this Court are proper under 28 U.S.C. § 1491(b). The Court of Federal Claims has jurisdiction "to render judgement on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation

16

in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Wave is an offeror under the Solicitation, whose proposal did not receive award. Through this bid protest and this filing, Wave challenges USMS' evaluation and award decision under the Solicitation. Had USMS engaged in proper discussions with Wave, treated Wave in an equal manner as compared to CMDSS and ▉ not acted arbitrarily, and properly evaluated offerors' ability to comply with the licensing requirements for this procurement, and properly considered the conflict of interest in this matter, Wave would have received award. As such, USMS' errors directly impacted Wave's economic interest, demonstrating prejudice. See BCPeabody Construction Services, Inc. v. United States, 112 Fed. Cl. 502, 507 (2013) ("A party can show the existence of a 'direct economic interest' by demonstrating that it had a 'substantial chance' of winning the award."). Wave, therefore, is an interested party, and this Court has jurisdiction to consider this protest.

**Standard of Review**

This protest and its resolution are governed by the Administrative Procedures Act ("APA"). See 28 U.S.C. § 1491(b)(4). In accordance with the APA, this Court will review an agency's award decision if USMS's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." SupplyCore Inc. v. United States, 132 Fed. Cl. 480, 488 (2017). As such, a procurement award decision may be set aside by the Court if USMS's decision lacked a rational basis or "if the procurement procedure involved a violation of regulation or procedure." WellPoint Mil. Care Corp. v. United States, 953 F. 3d 1373, 1377 (Fed. Cir. 2020). In order for a protestor to succeed in a bid protest in front of this Court, the protestor must "show a significant, prejudicial error in the procurement process." Id. at 1377. When presented with a genuine issue of material fact, the Court is empowered to resolve such issue based on information within the administrative record. BCPeabody, supra at 505 n.2. In addition, a court's decision on a Motion

17

for Judgment on the Administrative Record is pursuant to Rule of the Court of Federal Claims ("RCFC") 52.1 and will determine if "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Bannum, Inc. v. United States, 404 F. 3d 1346, 1356-1357 (Fed. Cir. 2005).

<strong>Argument</strong>

There were numerous errors on the part of USMS with regards to this procurement. Above all, USMS engaged in misleading discussions with Wave, and then, when it finally let Wave know what it really felt was the concern with its proposal, it failed to give Wave enough time to make a meaningful response. Additionally, USMS disparately treated Wave and ███'s proposal, finding no issue with ███'s undocumented statement that it could handle unsupported assets while treating a similar statement by Wave as damning. USMS also inexplicably lowered Wave's Factor 1 rating, which improperly lowered Wave's chances of award. USMS also failed to determine CMDSS and ███'s ability to comply with applicable licensing requirements, thereby deviating from stated evaluation criteria. Finally, USMS' investigation of the OCI that has plagued this procurement came to an unreasonable conclusion. Such an OCI inherently calls the entirety of the procurement process into question and is more than enough reason to sustain this protest.

### A. USMS Engaged in Misleading Discussions and then Failed to Give Wave Sufficient Time to Respond to Discussions.

FAR 15.306 requires that, when discussions are conducted, "the contracting officer *must*…indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3) (emphasis added). As discussions were undertaken by USMS, "Analytical & Research Technology counsels that '[d]iscussions, when they

18

are conducted, must be meaningful and must not prejudicially mislead offerors.'" AM Gen., LLC v. United States, 115 Fed. Cl. 653, 679 (2014) (quoting Analytical & Rsch. Tech., Inc. v. United States, 39 Fed. Cl. 34, 48 (1997)). "For discussions to be meaningful, and therefore adequate, they must 'generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit.'" D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 40 (2011) (quoting Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 384 (2003)). "[D]iscussions are misleading 'when the Agency misdirect[s] the protestor as it revises its proposal.'" Agile Def., Inc. v. United States, 143 Fed. Cl. 10, 20 (2019), aff'd, 959 F.3d 1379 (Fed. Cir. 2020) (quoting Greenland Contractors I/S v. United States, 131 Fed. Cl. 216, 225 (2017)). Further, when it comes the requirement that discussions be meaningful, "[t]he substance of the requirement is that the protestor should be given at least one meaningful opportunity to respond to significant weaknesses." Sentrillion Corp. v. United States, 114 Fed. Cl. 557, 570 (2014). FAR 15.306(e) also requires that "Government personnel shall not engage in conduct that favors one offeror over another" such as highlighting solicitation compliance concerns for certain offerors in discussions but doing the same for other offerors. AshBritt, Inc. v. United States, 87 Fed. Cl. 344, 369 (2009).

Neither a pre-proposal Q&A session nor the Solicitation itself can serve as discussions. FAR 15.306 makes it clear that discussions only occur with those offerors in the competitive range. See FAR 15.306(d)(1). The competitive range cannot be established prior to the receipt of proposals. Wave is well aware of this Court's observation on the question of discussions that "Wave read the PWS, knowingly submitted a non-conforming proposal, and disregarded the clarifying Q&A responses" and that what attempt at discussions USMS did make was "a courtesy considering that Wave intentionally submitted a proposal that deviated from the PWS's

19

requirements." ECF 32 at 7-8. Respectfully, this position would undercut FAR 15.306(d) on discussions. It states "the contracting officer *must*…indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3) (emphasis added). How can this requirement have any heft to it if, by having a deficiency, one is disqualified from receiving meaningful discussions when other offerors receive discussions? The regulation does not provide for an exception to this requirement. Discussions *must* identify what USMS believes are deficiencies to the offeror when they are undertaken. This is not even a matter of case law. It is in the very regulations on discussions. It is binding on this Court. As such, USMS had the obligation to ensure that its discussions with Wave were meaningful since it chose to engage in discussions. USMS failed in this regard.

1.  **USMS' Discussions Misled Wave.**

First, these discussions were misleading. Initially, Wave proposed hardware wallets:

AR 1525, PA 49. In the first set of discussions on June 26, 2024, USMS indicated that it felt this plan would not suffice as these hardware wallets would not be insured or included in SOC audits. AR 1951, 1960; PA 74, 83. It was at this point that Wave proposed a fast liquidation plan on July 1, 2024:

> Wave understands that, per the PWS, USMS expects that many or all of the Class 2 and Class 4 assets cannot be liquidated on or supported by the major exchanges/platforms, and expects that Wave will exchange such USMS Assets for assets that are supported by major exchanges/trading platforms (a "USMS Asset Swap"). Wave expects that many assets that are not supported by the ▉▉▉ platform ("Unsupported Assets") will also not be supported by major

20

███████████████████████████████████

███████████

exchanges/trading platforms. Accordingly, Wave generally expects that many of the Unsupported Assets will be converted into assets supported by ██████ ("Supported Assets"), per the PWS and as instructed by USMS.

AR 1952, PA 75. Note: Wave never once said it would engage in this plan without USMS authorization. In any case, as of these discussions, USMS came under the impression that Wave planned to immediately swap unsupported assets upon receipt without USMS approval.

What's important here is that USMS made the decision in September 2024 to engage in a further set of discussions before the final set of discussions in October. On September 6, 2024, USMS asked Wave: "The US Government has an additional question under the Discussions phase, and it concerns the following: What is the fee structure associated with liquidating cryptocurrency assets? Are the fees taken directly from the asset? If so, at what percentage rate in basis points." See AR 1966, PA 88. Wave responded that it was ████████████████████████

████████████████████████████████████

████████████████████ Id. There are two things notable here. First, USMS acknowledged that these were indeed "discussions" as described by FAR 15.306(d). FAR 15.306(d) observes:

> Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract. When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions.

FAR 15.306(d). Here, USMS specifically engaged in bargaining, seeking persuasion and potential alteration of assumptions with regards to, among other things, pricing. As USMS was engaged in discussions, then, "[a]t a minimum, the contracting officer must…indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror *has not yet had an opportunity to respond*." FAR

21

15.306(d)(3). Therefore, it was incumbent upon USMS to identify to each offeror "deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond" in this set of discussions. As noted above, USMS clearly had all the information it needed to conclude that Wave's plan to swap unsupported assets was unacceptable. It had this information as of July 1, 2024. As noted throughout the TEB report, this was *the* issue with Wave's proposal. Even if this issue arose from revision of its proposal, the fact remains that Wave had "not yet had an opportunity to respond" to this matter. By engaging in discussions, the Agency was obligated to inform Wave of the same. It was obligated to then raise this issue with Wave. The only issues that USMS did not have to discuss were the issues USMS raised in the first round,[17] that was up to Wave to address. But USMS had to indicate to Wave that the proposed unsupported assets swapping plan was an issue since that was USMS' position and Wave had not had a chance to respond to the same. But it did not do this in the second round of discussions. It simply asked about fee structure. It was only in the last set of discussions that USMS finally raised the unsupported assets issue with Wave.

For the record, it is worth observing that USMS based its conclusion on a review of ███'s website. Crypto exchanges are constantly working in the background to bring new crypto assets to the public for their main platforms, however, public-facing support for a particular crypto by an exchange and their back-end abilities are two different things entirely. A public-facing web page of an exchange would never be expected to uncover that exchange's full capabilities, much less what capabilities they were working upon with bidders for the bespoke private support of the solicitation's requirements. USMS' inquiry with ███'s forward-facing website was always going

---

[17] Indeed, the agency's question "What swapping mechanisms are available for assets not supported by the popular exchanges?" if anything suggested that such a swapping plan was acceptable. AR 1960, PA 83.

22

to fail. The PWS definitions for Class 2 and 4 assets includes, "Cryptocurrencies that ...cannot be liquidated on most exchange platforms." AR 157, PA 16. The reasons for an exchange to not publicly support an asset (i.e. unable to liquidate) are varied: risk concerns, classifications, consumer protections, lack of interest, etc. It is well understood that major exchanges like ████ have intake and liquidation abilities beyond their mainstream platforms. The Agency should not have relied on extrinsic evidence to evaluate the clear language dealing with the Wave team's ability to handle all relevant cryptocurrencies. RBVETCO, LLC v. United States, 172 Fed. Cl. 566, 578 (2024) (quoting Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320 (Fed. Cir. 2011)) (agency "may rely on that certification" with regards to a proposal requirement).

In any case, these discussions misled Wave with regards to what it perceived were USMS' concerns with its proposal. Had USMS raised the issue in the second set of discussions in September and given Wave a reasonable time to respond, it'd be a different story. Wave would have provided a more than sufficient solution for USMS, would have received at least equal ratings to CMDSS, and thus would have received award. At the very least, if Wave had not provided a proper response then, USMS's position would stand to reason. But USMS instead chose to wait until October 24, 2024, to raise this issue. That, too, might be forgivable, save for the fact that USMS failed to give Wave a meaningful opportunity to respond.

## 2. USMS Did Not Give Wave a Meaningful Opportunity to Respond to its Final Discussion Request.

When it comes the requirement that discussions be meaningful, "[t]he substance of the requirement is that the protestor should be given at least one meaningful opportunity to respond to significant weaknesses." Sentrillion Corp. v. United States, 114 Fed. Cl. 557, 570 (2014). The Ninth Circuit has observed in a separate context that "[i]mplicit in the 'opportunity to respond' is

23

the requirement that sufficient time be afforded" for a person to respond where an opportunity to respond must be given. See Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan, 662 F.2d 641, 645 (9th Cir. 1981). A showing of how additional time would give an offeror a meaningful opportunity to respond will support a finding that the agency failed to provide said meaningful opportunity. See CACI Field Servs., Inc. v. United States, 13 Cl. Ct. 718, 734 (1987), aff'd, 854 F.2d 464 (Fed. Cir. 1988) (Finding a failure to explain how additional time would allow for a meaningful response prevented the court from concluding the time given was insufficient.)

To the extent USMS' position regarding Wave's plan for swapping cryptocurrencies was justified, USMS failed to bring up this issue until October 24, 2024. AR 1969, PA 89. It then only gave Wave a single day to completely retool how it approached the cryptocurrency support issue. Id. This was not a meaningful opportunity to respond.

A comparison is helpful here. On September 6, 2024, USMS asked Wave: "What is the fee structure associated with liquidating cryptocurrency assets? Are the fees taken directly from the asset? If so, at what percentage rate in basis points." AR 1966, PA 88. Wave was given until the end of the business day to respond. Id. At first glance, this seems to suggest that a day was plenty of time for Wave to respond to the third set of discussions. However, here, the scope of the inquiry was far more limited and only required a very simple answer:

See id.[18]

Contrast this with the third set of discussions, in which USMS informed Wave of its thoughts on the swapping issue. See AR 1969, PA 89. Referring to four separate questions from

---

[18] The first round of discussions was no more helpful for Wave, as USMS asked, "What swapping mechanisms are available for assets not supported by the popular exchanges?", indicating that a swapping plan was acceptable. AR 1960, PA 83.

the first set of discussions, USMS requested an alternative solution to a matter that touched on initial intake considerations (see AR 1524-26, PA 48-50), storage considerations (see AR 1526-30, PA 50-54), and liquidation considerations (see AR 1530-33, PA 54-57). This issue covered aspects of practically every specific requirement under the PWS. See AR 152-57, PA 11-16. Providing a sufficient response would take a good deal of time, far more than just a single day. Even if the Court thinks a reasonable response could have been provided in a day with effort on the part of Wave, it needs to take into account the fact that any response would require coordination with ████, Wave's subcontractor. ████ would need to discuss the matter with Wave and determine the appropriate response in conjunction with Wave, verify its new plan would meet the agency's needs, and then, Wave would need to communicate said plan to USMS in a detailed manner, with regards to a potential contract worth eight figures. Failure to respond or an incomplete response was not an option. It is also important to remember that, through at least the second set of discussions, USMS had given Wave the notion that its proposed swapping plan for unsupported assets was acceptable. At the very least, the Agency had all of July, August, September, and up through October 24 to raise this issue with Wave in a discussion if it was so vital of a matter. To say that Wave was blindsided by this is an understatement. Wave undertook the best course of action it reasonably could in the moment.

The PWS requirements for the Class 2-4 assets are not just in the complex and technical field of crypto, but pertain to the most obscure and difficult-to-custody crypto assets. It takes months to put together a proposal for this type of project, and in this instance there were two RFI's—issued on Aug 25, 2023, for the Class 1-4 crypto assets—that helped provide a buffer of months to conduct the enormous pre-planning. Interested bidders started planning for the eventual April 18, 2024, Class 2-4 RFP release in late 2023 by formulating custody plans, developing

25

lengthy support matrices for thousands of cryptocurrencies, considering subcontractors, making inroads with crypto insurance providers, SOC audit firms, development ideas for the inventory management system that would need to be customized to meet requirements, and contingent financing and personnel, among others.

A detailed answer would take more than one day, but with great effort Wave was able to affirm that a solution consistent with the PWS could be accomplished prior to award performance. The abbreviated deadline and lateness of the discussion issue was not of Wave's making. Early on, USMS was, (1) aware of Wave's swapping plan, (2) aware that Wave's plan would not meet its approval, and (3) made no attempt to engage in a meaningful discussion with Wave about the issue until such time it was during the last hours of the solicitation's open period.

DOJ may point out CMDSS and ███'s responses to their respective sets of discussions after the first set, so as to say "If they could do it, why not Wave?" It is worth, however, keeping in mind the nature of those discussions. Those later discussions only concerned pricing revisions and clarifications on proposed items, they did not involve the complete retooling of how either CMDSS or ███ would have to perform the contract. There was not the same need for either CMDSS or ███ to coordinate a new solution with their subcontractors. ███, for its part, simply had to explain why its proposed price structure was useful and clarify its time estimations. See AR 1806-13, PA 59-66. There was no need for it to even discuss anything with its subcontractors, let alone work with said subcontractors to prepare a change to a key portion of its proposal. As for CMDSS, similarly it was a question of price clarification. See AR 1869-70, 1908-09; PA 67-68, 69-70. There was little response needed on CMDSS' part, just the provision of some pricing tables and some clarifying statements. Certainly, if Wave's third set of discussions was of a similar

26

nature, a single day would have sufficed. But it was not. USMS wanted Wave to retool an entire aspect of its proposal. Such an ask in a mere day was completely unreasonable.

If USMS engages in discussions, those discussions must, as a matter of federal procurement law, give the contractor a meaningful opportunity to actually respond in a manner that supports its proposal. Giving an offeror a single day to essentially revamp its proposal for a multi-million dollar procurement is not a "meaningful opportunity to respond." This prejudiced Wave as it was this issue that was the sole reason why Wave did not receive award, as discussed below.

**3. Wave was Prejudiced by the Misleading Discussions and the Failure of USMS to Give Wave a Meaningful Opportunity to Respond.**

DOJ might further argue that, even if misleading or unequal discussions exist here, Wave would still not have received award due to other issues with its proposal. This is incorrect. USMS expressly stated that the reason it found Wave's proposal deficient was the unsupported assets issue: "Wave's proposal does not sufficiently account for insurance, SOC audits capabilities, and custodial methods for cryptocurrency assets not supported by ▮▮▮▮'s platform, the latter aspect making its overall proposal deficient and not eligible for award." AR 2083, PA 145. Nonetheless, DOJ will rest its argument on this language:

> Wave's response to discussion questions related to the insurance coverage of unsupported assets includes that ▮▮▮▮'s custody platform will cover unsupported assets because they will have been (1) converted to a supported asset in an asset swap (2) sold with proceeds returned to USMS or held in stable coins (3) burned. This is not feasible as seized cryptocurrency must remain in the same way they have been seized in until an authorizing document is received. This answer continues to show a **deficiency** in the proposal for insurance coverage.

AR 2043, PA 117 (emphasis original). From this, DOJ shall assert that it does not matter what Wave did with regards to the unsupported assets issue, it "continue(d) to show a deficiency" with

27

regards to insurance coverage which implies that this was a preceding issue. However, a review of

USMS's earlier analysis shows this not to be the case:

> **Risk:** In the proposal, the main company states "Wave is exploring commercial crime and cybercrime insurance and can obtain the aforementioned additional coverage if required," though it is required per the PWS. The proposal doesn't provide a holistic approach to insurance, and it is unclear who will file a claim for which events.

AR 2042, PA 116 (emphasis original). Initially, the matter was described as purely a "risk," not a

"deficiency." If the agency truly intended to describe the above as a deficiency, it would have done

so. It purposefully chose to describe it as a mere "risk" and emphasized the same. A risk is not

automatically disqualifying. CMDSS received a couple risks under Factor 1, Subfactor 1(iii). See

AR 2030, PA 114 ("Coverage for destruction and security failures not included in the proposal,

unless covered by General Liability; not specified **(risk)**. The proposal does not provide details on

how USMS will be made whole for noncovered or partially covered loss, only that "the Contractor

will make the USMS whole" **(risk)**." (emphasis original)). We cannot know what USMS would

have done had Wave not proffered the unsupported swapping plan, that would be pure speculation.

This Court has been clear on the question: It will not speculate on what the agency might have

done "in the absence of the procurement error." See Dynacs Eng'g Co. v. United States, 48 Fed.

Cl. 614, 619 (2001).

Something, then, transformed what was a mere "risk" into a "deficiency." What changed?

The unsupported assets plan. Again, it all comes back to the fact that the only reason Wave

received a "low confidence." If it were not for this, there wouldn't have been any deficiencies.

Even if other risks remained, the only subfactors where Wave received "Low Confidence" ratings

were those that involved the unsupported assets issue. At the very least, it is unknown what USMS

would have rated Wave for those subfactors without the unsupported assets issue. Since USMS

28

failed to give Wave a meaningful opportunity to respond on that issue in the discussions, this leaves the Court with only one choice: it must find prejudice against Wave. See Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 421 (2018) ("The prejudice analysis in these circumstances acknowledges that a substantial chance of award to the protestor exists even if the precise contours of the but-for world cannot be discerned.").

### B.      USMS Engaged in Disparate Treatment of Wave and █████'s Proposals.

"Contracting officers are…required to ensure that offerors 'receive impartial, fair, and equitable treatment.'" Red River Computer Co. v. United States, 120 Fed. Cl. 227, 238 (2015) (quoting FAR 1.602-2(b)). To prevail on a claim of disparate treatment, "a protestor must show that USMS unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." Off. Design Grp. v. United States, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citations omitted). The case law does not specify that only disparate treatment between the awardee and the protester is relevant to such analysis. See generally id. An evaluation will be found unreasonable where "an agency disparately treated 'nearly identical provisions in the proposals under consideration.'" Ekagra Partners, LLC v. United States, 170 Fed. Cl. 1, 105 (2024) (quoting Off. Design, supra at 1373).

Wave received a "Low Confidence" rating, and thus lost out on award, solely because its proposal, under Subfactor 3 of Factor 2, "lacks details of a sufficient plan for cryptocurrency assets that are not traditionally supported by platforms like █████ without some form of manipulation." AR 2054, PA 128. No other justification for the rating is provided. Assuming such a rating is even justified (contrary to what is in the Solicitation), USMS' evaluation of Wave stands in stark contrast to its evaluation of █████'s proposal.

29

DOJ will no doubt rest its argument on the assertion that there was some sort of great distinction between ▮▮▮ and Wave's proposals. Indeed, this Court stated: "Wave compares ▮▮▮'s lack of a detailed plan to its own lack of a plan, arguing that their proposals were 'substantively indistinguishable.'" ECF 32 at 8. This observation, of course, was made prior to the provision of the administrative record. While eminently reasonable at the time, the revealed evidence shows otherwise. At the time, it was unknown to Wave if perhaps ▮▮▮'s discussions provided detail on how ▮▮▮'s engineering team concluded it could provide cold storage for unsupported assets. Perhaps the agency had simply summarized ▮▮▮'s statements. This was not the case. USMS essentially repeated ▮▮▮'s statement verbatim. ▮▮▮ did not provide an actual plan for unsupported assets at initial intake. It simply stated that it "can provide cold storage by default intake and storage of all the listed Class 2 - 4 assets." AR 1769, PA 58. This is a mere unsupported assertion. There is no practical difference between Wave saying "[o]ur subcontractor ▮▮▮'s platform will support all assets, and there is no need for the swapping of assets prior to disposal or otherwise in order to meet the requirements outlined in the PWS," and ▮▮▮ stating "we can provide cold storage by default intake and storage of all the listed Class 2 - 4 assets."

Of course, DOJ will point to the language that follows ▮▮▮'s unsupported statement that it will provide cold storage for otherwise unsupported assets. At first glance, this appears to provide a plan for those unsupported assets. But there are issues with that conclusion. First, this speaks to full, permanent wallet support that cannot immediately be provided, as the language describes how, for assets that aren't supported immediately, they will be "added" with "effort." Id. To be sure, that language comes from discussion of "low complexity" assets where the assets can, per ▮▮▮, be added quickly. But the point is that, if assets are unsupported, full wallet support will not

████████████████████████████████████████

████████████

be achieved instantaneously. There must be an initial means of intermediate storage.[19] This, per

████, is the cold storage. See id. However, simply stating "We can provide cold storage," is not

saying much of anything at all. Cold storage is the basic form of initial intake, indeed, the

Solicitation required that each offeror describe their initial intake process by providing "their

process for how they would intake a cryptocurrency asset to be held in cold storage." AR 137, PA

5. Wave's proposal very much described how it would intake assets via cold storage. See AR 1514,

PA 47 ("Once assets are secured in ████ Custody *(Cold Storage)*, USMS-authorized users can

provide instructions and legal documentation authorizing the transfer and/or return of any seized

assets to the PM who will notify ████." (emphasis added)). That is how it has to be done.

Hardware wallets are cold storage. "Cold storage" simply means "storage not connected to the

internet." See Investopedia, "Cold Storage: What It Is, How It Works, Theft Protection."[20] So, by

████ simply saying "We can provide cold storage," at initial intake, it is essentially just saying

"We concluded we can store the assets" without any further detail. Indeed, the PWS even observes

that Class 4 cryptocurrencies are "Cryptocurrencies that are not supported by cold storage wallets

and cannot be liquidated on most exchange platforms." AR 151, PA 10. ████'s statement, as such,

essentially is just saying "Well actually those cryptocurrencies are supportable" without further

justification. There is no actual distinction between that and stating "████'s platform will support

all assets, and there is no need for the swapping of assets prior to disposal." If the latter is simply

an unsupported conclusion that Wave can intake the unsupported assets, the same is true of what

████ said.

---

[19] DOJ may argue that, with the "high complexity" assets, even if ████ can't support those, it doesn't matter as they are of inconsequential value. But as ████ itself notes, these high complexity cryptocurrencies "become valuable evidence used in legal proceedings." AR 1769, PA 57. ████ observes that initial intake storage will be necessary. See id. ("Or is it sufficient to simply store the hardware wallet(s) associated with these assets offline in the ████████ vault until either they pass some agreed-upon minimum asset value or liquidity metric?"). Thus, there at least has to be a period where those assets are held onto, and that's initial intake.

[20] Available at https://www.investopedia.com/terms/c/cold-storage.asp (Accessed September 5, 2025).

███████████████████████████████████████████
████████████████████

DOJ may claim that the risk assigned to Wave under Factor 2, Subfactor 4(i), shows a distinction. There, the TEB report states "This proposal does not explain the cold storage methods for assets not supported by ████'s Cold Custody solution although the majority of the assets will not be supported by it." AR 2049, PA 123. But there is no distinction between that and "████ does not provide a detailed proposal on how they will handle unsupported assets, just that they can." AR 2061, PA 135. The findings are the same: Both companies have cold storage but did not provide details on how they will handle unsupported assets. ████ then essentially stated in its discussions, "We conclude we can take in the unsupported assets." See AR 1769, PA 58. ("Team ████'s engineering group concluded that we can provide cold storage by default intake and storage of all the listed Class 2 - 4 assets."). That's just blindly asserting it can take in unsupported assets, that's how intake is done. ████ might have well just said, "Well, USMS, we can intake those assets."

The exact same claimed issue that was fatal for Wave's proposal was apparently of little consequence with regards to ████'s proposal. If USMS concluded that Wave's proposal and discussions simply asserted that it will be able to intake unsupported assets, the same must be said of ████'s proposal. There was no substantive difference between Wave and ████'s proposal for this matter. Neither provided details on how they would handle said assets, just that they could. Even in the apparent discussions between ████ and USMS, all that occurred was that ████ affirmed it could intake all Class 2-4 assets without any further detail.[21] But, ████ was not downgraded out of the competition for this issue.

---

[21] ████ even acknowledged that for "High Complexity" assets, it may not be able to support the same. See AR 1769, PA 57 ("Supporting these assets while meeting all of ██████'s engineering design principles is at risk of being unlikely and/or requires a high level of custom engineering.").

32

███████████████████████████████████████████████████

████████████████

No doubt DOJ will argue that this is all very reasonably argued but at the end of the day, ████ was not the awardee, CMDSS was. As such, it will claim that this is all irrelevant. Accepting such a position would essentially give the agency a pass for blatant disparate treatment that resulted in one offeror being basically eliminated from contention. If ████ received such treatment, Wave was certainly entitled to same. The fact ████ is not the awardee is irrelevant here. Equal treatment demands that Wave be evaluated with the same logic that ████ was evaluated. "[I]t is beyond peradventure that a contracting agency must treat all offerors equally, *evaluating proposals evenhandedly against common requirements and evaluation criteria.*" Constellation W., Inc. v. United States, 125 Fed. Cl. 505, 553 (2015) (emphasis added) (quoting Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 383 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)). In fact, this court just recently found disparate treatment of an unsuccessful offeror with regards to another unsuccessful offeror sufficient grounds to sustain a protest since, had the former been treated the same as the latter, the former would have had a substantial chance at receiving award. See Advanced Tech. Sys. Co. v. United States, No. 25-515, 2025 WL 1984372, at *12 (Fed. Cl. June 27, 2025) ("Within the context of the paragraph in which this "observation" sits, this sentence has a negative implication, demonstrating the Navy's disparate treatment of ATSC's and [Redacted] past performance references.").

DOJ might further argue that, even if disparate treatment of unsuccessful offerors can be sufficient grounds to sustain a protest, Wave would still not have received award due to other issues with its proposal. However, a review of the TEB report shows that the sole reason that Wave received a "Low Confidence" rating for Factor 2 and thus overall was the unsupported assets issue, as discussed above. DOJ will rest its argument on this language:

> Wave's response to discussion questions related to the insurance coverage of unsupported assets includes that ████'s custody platform will cover unsupported

33

> assets because they will have been (1) converted to a supported asset in an asset swap (2) sold with proceeds returned to USMS or held in stable coins (3) burned. This is not feasible as seized cryptocurrency must remain in the same way they have been seized in until an authorizing document is received. This answer continues to show a deficiency in the proposal for insurance coverage.

AR 2043, PA 117. From this, DOJ shall assert that it does not matter what Wave did with regards to unsupported assets. However, as shown earlier, the deficiency in question was entirely the matter of the unsupported asset issue. USMS assigned Wave a mere risk for the insurance issue. See AR 2042, PA 116. The deficiency only arose with regards to the unsupported assets issue. Without it, it was a mere risk, something that CMDSS and ▆ both had plenty of without it resulting in the rejection of their proposals.

Had Wave been treated the same as ▆, Wave, too, would have received at least a "Some Confidence" rating for Factor 2 and, thus, a "Some Confidence" rating overall. Had such a rating been received, this would have put Wave at the very least technically on par with CMDSS. Considering, then, that Wave offered a lower price than CMDSS, the only reasonable conclusion USMS could make in such a situation is to award the Contract to Wave. Thus, Wave was clearly prejudiced by USMS' disparate treatment.

### C.    USMS Arbitrarily Lowered Wave's Factor 1 Rating.

"It is for the agency to decide which proposals present the best value to the government, and so long as those determinations are not irrational and are adequately documented, the Court must uphold them." Tech. Innovation All. LLC v. United States, 149 Fed. Cl. 105, 176 (2020). However, "[w]hile evaluators may change their minds, they risk a finding of arbitrary decision making when such a change is not explained." Res Rei Dev., Inc. v. United States, 126 Fed. Cl. 535, 557 (2016). "[I]t is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review.'" Centerra Sec. Servs. GmbH v. United States, 176 Fed. Cl.

219, 238 (2025) (quoting <u>Timken U.S. Corp. v. United States</u>, 421 F.3d 1350, 1355 (Fed. Cir. 2005)). "Effective review requires a record that contains documentation of the agency's decision-making process." <u>L-3 Commc'ns Integrated Sys., L.P. v. United States</u>, 98 Fed. Cl. 45, 50 (2011)

In its initial notice to Wave, USMS stated that it assigned Wave a rating of "High Confidence" for Factor 1. <u>See</u> AR 843, PA 34. However, without any explanation, the TEB report indicates that USMS assigned Wave a rating of "Some Confidence" for Factor 1. <u>See</u> AR 2018, PA 103. Wave's counsel carefully reviewed the Administrative Record for some explanation of this discrepancy. This search was unavailing. For instance, the TEB Chair Confidence Assessment merely says that Wave got "some confidence" and makes no reference to the earlier High Confidence and in fact says "Factor 1 Experience rankings (in order of highest confidence level) were CMDSS, Wave, and ▮▮▮▮." AR 1979, PA 91. So, CMDSS jumped above Wave even though CMDSS initially received a Some Confidence rating. AR 693, PA 33. As noted above, it is one thing for USMS to change its mind regarding a rating, it is another to simply change the rating without any explanation. A downgrade without reason is arbitrary, and indicates a goal of leveling the playing field between Wave and CMDSS on Factor 1.

DOJ will make two defenses here. First, it will argue that the documentation nonetheless explains USMS' position sufficiently so as to justify the rating of "Some Confidence." Second, it will argue that even if USMS erred, it is irrelevant as the issue with Wave's proposal was in Factor 2, and so there was no prejudice to Wave.

With regards to the first argument, considering the discussions that occurred, not informing Wave of the downgrade deprived Wave of the opportunity to provide critical feedback about its proposal, presentation, and knowledge/awareness of weaknesses. For all Wave knew, the "High Confidence" rating meant USMS felt Wave would need little to no intervention to successfully

perform the contract. Additionally, the fact remains that USMS did not actually explain any reason for the change in rating. Again, "[w]hile evaluators may change their minds, they risk a finding of arbitrary decision making when such a *change* is not explained." Res Rei, supra.[22]

With regards to prejudice, Wave will acknowledge that, in the event all of its other arguments should fail, there will not be any prejudice to Wave. However, in the event that Wave's arguments succeed, in particular with regards to Factor 2, it is very relevant as this error prevented Wave from having a higher rating for Factor 1 than CMDSS. If Wave's rating for Factor 2 is upgraded to "Some Confidence," that would give it equivalent technical ratings to CMDSS on Factor 2 and higher on Factor 1, with a lower price than CMDSS. By itself, this should result in award to Wave. But, in the event USMS were to make some argument otherwise, this error would clearly establish that not only did Wave have at least an equivalent rating to CMDSS on Factor 2 as well as a lower price, but also a superior rating to CMDSS on Factor 1. Thus, USMS would certainly be left with no choice but to award Wave.

In addition to the former item, we also note that the PWS required that offerors provide a compliance officer that has "[s]trong knowledge or experience dealing with regulators and agencies, including Financial Crimes Enforcement Network ('FinCEN'), the Office of Foreign Assets Control ('OFAC'), the Internal Revenue Service ('IRS'), the Consumer Financial Protection Bureau ('CFPB'), the Securities and Exchange Commission ('SEC'), or other federal or state financial services regulatory bodies." AR 167, PA 26. At the same time, USMS observed with regards to CMDSS' proposal for Factor 2, Subfactor 6: "The Compliance Officer proposed by CMDSS does not have extensive experience working with FinCEN, OFAC, CFPB as required by the PWS." AR 1990, PA 92. Despite this, USMS nonetheless assigned CMDSS a rating of

---

[22] Ignoring a change, as USMS did here, is the opposite of explaining a change in rating.

36

"Some Confidence" for this item, despite failing to meet a mandatory requirement of the procurement. See id. This should have resulted in CMDSS receiving a "Low Confidence" rating for this subfactor, and indeed Factor 2 as a whole. This would have, at the very least, put CMDSS on a lower rating than Wave. Coupled with the unequal treatment received by Wave with regards to ▮▮▮▮, it is clear Wave should have received a superior technical rating to CMDSS. Unlike the language with regards to swapping, the Solicitation was expressly clear that strong experience with regulators and agencies was required for the compliance officer role. Yet, USMS treated this deviation as though it were merely optional. This is highly improper and goes to the agency's general uneven treatment of this procurement.

**D.      USMS Deviated from Evaluation Criteria regarding Licensing.**

Where an agency deviates from the stated terms for a solicitation in its evaluation, that evaluation is unreasonable and contrary to law. See People, Tech. & Processes, LLC v. United States, 151 Fed. Cl. 713, 722 (2020); see also State v. United States, 134 Fed. Cl. 8, 24 (2017). An agency may not evaluate in a manner that is inconsistent with the scheme set forth in the solicitation for the evaluation. See FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 391 (2011) (observing that the agency's evaluation was reasonable as it was not inconsistent with the scheme set forth in the solicitation).

For the oral presentation portion of the procurement, the Solicitation observes that offerors "must address the following" item: "Describe how your system ensures compliance with regulations and laws related to the selling of cryptocurrency assets." AR 134, PA 4. This establishes that showing ability to comply with the law, which includes licensing requirements, was an evaluation criterion.

37

The cryptocurrency assets in question are securities under established SEC guidance and case law. See Sec. & Exch. Comm'n v. Coinbase, Inc., 726 F. Supp. 3d 260, 287 (S.D.N.Y. 2024) ("[B]oth the SEC and private litigants have brought several successful actions in this Circuit predicated on crypto-assets falling within the *Howey* definition of an 'investment contract.'"). Further, the Investment Advisers Act of 1940 ("Advisers Act") states:

> "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2. Under the Solicitation, the contractor will "recommend and advise on the proper classification of new cryptocurrencies seized," AR 154, PA 13, and "make recommendations regarding the most prudent method of disposal (exchange vs trade desk) for the amount and/or type of cryptocurrency that is forfeited." AR 156, PA 15. The contractor will provide advice on the value of securities and otherwise provide analysis and reports concerning securities. This means the awardee under the Solicitation is an "investment adviser" under the Advisers Act. It is unlawful for an investment adviser to receive compensation for managing securities on behalf of others without obtaining appropriate SEC licensure. See 15 U.S.C. § 80b-3. Furthermore, many states regulate cryptocurrency movement in the same way they regulate fiat currency. Money transmitter licenses ("MTLs") are state-specific regulatory requirements for businesses handling the transfer of money. Both CMDSS and ███████ lacked the proper licensures at the time of offer. See AR 2389-408, PA 148-67. As discussed in the GAO protest, it would be unreasonable to expect either company to acquire the licensures required by the time of performance. See AR 2409-10, PA 168-69. Despite the same, USMS failed to inquire about this at all.

DOJ will likely assert that this is a mere contract administration issue. However, it is not. The Solicitation itself expressly provides that offerors are to "[d]escribe how your system ensures compliance with regulations and laws related to the selling of cryptocurrency assets." AR 134, PA 4. It is absurd to argue that an offeror's inability to show their own compliance with regulations and laws related to the selling of cryptocurrency assets could nonetheless allow for a finding that the offeror's system is compliant with those same regulations and laws. The contractor is not a watchmaker who simply creates the product and moves on, it is going to be actively involved in the performance of the work in question throughout the duration of the contract. As such, its own ability (or lack thereof) to comply with applicable regulations and laws very much speaks to how its "system ensures compliance with regulations and laws related to the selling of cryptocurrency assets. This Court should find accordingly.

E. **USMS Failed to Properly Evaluate an Organizational Conflict of Interest ("OCI").**

Agencies must "'analyze planned acquisitions in order to ... [i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible.'" McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 404–05 (2013) (quoting FAR 9.504(a)(1)). Cases have identified three distinct types of OCIs. Turner Const. Co. v. United States, 94 Fed. Cl. 561, 568 (2010), aff'd, 645 F.3d 1377 (Fed. Cir. 2011) (citing Aetna Gov't Health Plans, Inc., B–254397 (Comp. Gen. July 27, 1995)). "An OCI must be established by 'hard facts' that indicate the existence or potential existence of a conflict." Turner, supra at 573 (citing C.A.C.I., Inc. v. United States, 719 F.2d 1567, 1582 (Fed. Cir. 1983). "These 'hard facts' do not need to show either an actual conflict or a negative impact from a conflict." Turner, supra at 573 (citing Lucent Techs. World Servs., Inc., 13–295462 (Comp. Gen., Mar. 2, 2005)). "The Federal Circuit has been

███████████████████████████████████████
███████████████

absolutely unambiguous in ruling that a bidder may be disqualified if the mere appearance of impropriety is indicated by hard facts." Turner, supra at 573 (citing NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir.1986)). Additionally,

> Any person who is an . . . employee . . . of the United States …and who, after the termination of his or her…employment…knowingly makes, with the intent to influence, any communication to or appearance before any … agency …on behalf of any other person (except the United States…) in connection with a particular matter—
>
> **(A)** in which the United States…is a party or has a direct and substantial interest,
> **(B)** in which the person participated personally and substantially as such officer or employee, and
> **(C)** which involved a specific party or specific parties at the time of such participation,
>
> shall be punished as provided in section 216 of this title.

18 U.S.C. § 207(a)(1).

USMS did technically look into the OCI issue. In an OCI memorandum, the agency noted both ████████ and ████████ worked on requirements for the predecessor solicitation, drafting both the requirements for that solicitation and sitting on the evaluation board for the same. AR 80-82, PA 1-3. In fact, while it is not entirely clear from the language, the memorandum could be read as suggesting they worked on the requirements for *this* procurement itself. In any case, USMS concluded that the risks "for both a conflict of interest and/or an unfair competition advantage" were "minimal under the identified scenario and circumstances. AR 82, PA 3. ████████ was touted in the CMDSS proposal, as the CMDSS teaming agreement with ████████ was entered on May 20, 2024 and signed by ████████, AR 1404-1413, PA 36-45 and ████████ and ████████ are touted in the teaming agreement as having experience with USMS, AR 1415, PA 46.

The nature of ████████' involvement (at the very least) made this conclusion erroneous. ████████ essentially (and perhaps actually) worked on the requirements for this very procurement.

40

18 U.S.C. § 207(a)(1) bars a federal employee from involvement in a procurement on behalf of a private party where the employee (1) participated personally and substantially in the matter and (2) involves a specific party or parties at the time of such participation. This Court has found merely working on the requirements even for a prior procurement in a series of procurements to entail personal and substantial involvement. See Raytheon Co. v. United States, 170 Fed. Cl. 561, 573 (2024) ("VK's participation was significant enough to have left his fingerprints on the Navy's EMD materials, which would make his work on EMD with Raytheon highly suspicious."); Trace Sys. Inc. v. United States, 165 Fed. Cl. 44, 60 (2023) (work on predecessor procurement contributed to OCI). Furthermore, submission of interest in a procurement makes one a "specific party" when it comes to a procurement. See Space Age Eng'g, Inc. v. United States, 4 Cl. Ct. 739, 742 (1984) ("No proceedings affecting the legal rights of specific parties occurred until June of 1980, when bids were received on the solicitation issued in January of that year…").

Under the established case law, ███████ personally and substantially participated in the preparation of this procurement. Even if this involvement was not direct on this procurement, ██ participation in the predecessor contract was participation all the same. As USMS acknowledged in its OCI memorandum: "AFD is still using much of the same requirement for the two cryptocurrency solicitations currently underway." AR 80, PA 1. The fact that some of these terms may have changed does not change the fact that ██ was substantially and personally involved in the matter. The Court in Raytheon observed that the government employee in question was involved in an overall contract program, and thus did not make any distinctions regarding one contract award under the program versus another. See Raytheon, supra at 567 ("At the risk of undue repetition, the NDA clearly treated the DBD program as a single procurement."). USMS no doubt will argue that the requirements had changed in the meantime, rendering this irrelevant, as

41

██████████████████████████████

it asserted in its OCI memorandum. <u>See</u> AR 81, PA 2. But USMS has yet to explain exactly what has changed with the requirements or why the "rapidly changing technical nature of the commodity" has affected material aspects of the procurement. This assertion is quite empty of any context. The commodities in question might change a great deal yet this would not change USMS' overall need. Were there not Class 4 cryptocurrency assets in 2022 and earlier? It is not as though we're talking about the late 2000s when there were a small scattering of cryptocurrencies at most. To describe the concept of these extremely obscure cryptocurrencies as something novel to the mid-2020s is absurd on its face. Dogecoin, a cryptocurrency that was actually created as a joke, was created in 2013. <u>See</u> Junkee, "An Interview with the Creator of Dogecoin: The Internet's Favourite New Currency."[23] Nothing in the PWS (and USMS has not pointed to anything in particular) speaks to any concept novel to the past decade. <u>See</u> <u>generally</u> AR 147-172, PA 6-31. As for "specific party," CMDSS bid on this very procurement with ████████ on its team. Furthermore, CMDSS has a history of working for USMS. <u>See</u> CMDSS, "Capability Statement." (Observing that CMDSS has been either a prime contractor or provided supporting work for USMS since April 2021.).[24] Therefore, in light of the above, ████████ is in violation of 18 U.S.C. § 207. This necessarily must prohibit award to CMDSS, regardless of USMS' position otherwise.

Of course, USMS will assert that it is all irrelevant here, as this does not speak to ████'s situation. But here, it is troubling that the agency did not take into account 18 U.S.C. § 207. "[A] CO has two distinct duties under FAR 9.504(a): the duty to evaluate potential OCIs as early as possible and the duty to mitigate significant potential OCIs before contract award." <u>Turner Const.</u>

---

[23] Available at https://archive.junkee.com/an-interview-with-the-inventor-of-dogecoin-the-internets-favourite-new-currency/27411 (Accessed September 8, 2025).

[24] Available at https://static1.squarespace.com/static/6690b2acfb2303093eed5361/t/66c5fa547f036f3efa4b8ea4/1724250708524/Capability+Statement.pdf (Accessed September 8, 2025).

<u>Co. v. United States</u>, 645 F.3d 1377, 1386 (Fed. Cir. 2011). USMS never sought mitigation measures in this procurement. Here, the OCI in question so thoroughly taints the procurement that prejudice exists. Thus, the arguments concerning the lack of eligibility for the other offerors and the OCI allegations establish prejudice.

### Conclusion and Relief Requested

USMS' evaluation and rejection of Wave's proposal as noncompliant was the result of a number of errors on USMS' part. First, USMS misled Wave with discussions, only to then turn around and give Wave no real opportunity to respond once it finally told Wave its actual position. In addition, USMS treated Wave and ██████ differently on the same unsupported assets issue even though their responses were identical, to Wave's detriment. USMS also inexplicably downgraded Wave's proposal under Factor 1. It further failed to evaluate CMDSS and ██████'s ability to comply with licensing requirements and further failed to properly investigate and resolve a serious OCI. As demonstrated above, the evaluations and award decision made by USMS should not stand.

Under the legal standard for injunctive relief, Wave meets the required factors, and once the court determines the award was unreasonable, injunctive relief would be warranted. Under 28 U.S.C. § 1491 this Court has the authority to "render judgment on an action by an interested party objecting to a solicitation by a federal agency" for bids on a Solicitation, such as this, and the Court may "award any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491 (b)(2). This Court has held that there are four factors to determine whether injunctive relief is warranted. <u>See Remington Arms Co., LLC v. United States</u>, 126 Fed. Cl. 218 (2016). These four factors are: (1) the likelihood of the Plaintiff succeeding on the merits; (2) whether the plaintiff "will suffer irreparable harm if the court withholds injunctive relief"; (3) whether the balancing of hardships to the parties involved favors a grant of injunctive relief; and

43

(4) whether the public interest is served by an injunctive relief. <u>Remington Arms Co., LLC</u>, 126 Fed. Cl. at 232 (quoting <u>Centech Grp., Inc. V. United States</u>, 554 F. 3d 1029, 1037 (Fed. Cir. 2009)). As shown above, (1) there are clear errors in the evaluation decision made by USMS that Wave should prevail on; (2) Wave will lose all investment and opportunity cost made in this proposal as well as a lucrative contract opportunity; (3) the hardship to the intervenors is less than those that were unfairly evaluated; and (4) the public interest is served by ensuring that the contracting process is held up to be fair and equal, unlike the evaluation process made by USMS here. Therefore, injunctive relief should be granted.

For the reasons stated herein, Wave's Motion for Judgment on the Administrative Record should be granted. Wave respectfully requests that the Court declare USMS' evaluation of proposals improper, terminate award to CMDSS, and direct award to Wave. Alternatively, the Court should declare the evaluation and award decision to CMDSS improper, conduct an equal, fair, and reasonable re-evaluation of Wave and ████'s proposals considering the above, while excluding CMDSS from the process due to the OCI. The Court should also grant: any necessary injunctive relief to carry out this decision; award of Wave's bid protest fees and costs and any other expenses incurred related to this action to the extent permitted under law (such as attorneys' fees); and any other relief the Court deems appropriate, just, and proper.