No. 25-928 C
(Judge Tapp)
BID PROTEST

Redacted Version

███████████

_____

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

WAVE DIGITAL ASSETS, LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

COMMAND SERVICES &
SUPPORT, INC.,

Defendant-Intervenor.

_____

DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

_____

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

Albert S. IAOSSI
Assistant Director

ELINOR J. KIM
Of Counsel:                                  Trial Attorney
C. JOSEPH CARROLL                            Commercial Litigation Branch
Senior Associate General Counsel             Civil Division
U.S. Marshals Service                        U.S. Department of Justice
CG3, 15th Floor                              P.O. Box 480
Washington, DC 20530-0001                    Ben Franklin Station
                                             Washington, D.C.  20044

June 13, 2025                                *Attorneys for Defendant*

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ............................................................................................................... 2

QUESTIONS PRESENTED ............................................................................................... 4

STATEMENT OF THE CASE ........................................................................................... 4

    I.      Nature Of The Case.............................................................................................. 4

    II.     Statement Of Facts............................................................................................... 6

          A.     Government Requirement And Solicitation............................................... 6

          B.     The Evaluation Factors.............................................................................. 6

          C.     The Evaluation and Award ........................................................................ 8

          D.     Agency Protests......................................................................................... 9

          E.     GAO Protest.............................................................................................. 9

ARGUMENT......................................................................................................................10

    I.      Standards Of Review ........................................................................................10

    II.     Wave Is Not Likely To Succeed On The Merits .................................................11

    III.    Wave Has Failed To Demonstrate It Will Suffer Irreparable Harm Absent
          Preliminary Injunctive Relief ................................................................................12

    IV.    The Balance Of Harm Favors The Government.................................................15

    V.     A Preliminary Injunction Would Be Contrary To The Public Interest..................19

    VI.    If The Court Grants A Preliminary Injunction, Wave Should Be Required To
          Post Bonds In The Amount Of At Least $927,703.25 Per Month ......................20

CONCLUSION....................................................................................................................21

**TABLE OF AUTHORITIES**

**CASES**                                                                                                      **PAGE(S)**

*Aero Corp., S.A. v. United States*,
   38 Fed. Cl. 237 (1997)...................................................................................................15, 18

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001)..............................................................................................11

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*,
   480 U.S. 531 (1987) ...........................................................................................................11, 12

*AshBritt, Inc. v. United States*,
   87 Fed. Cl. 344 (2009)........................................................................................................1, 5, 6

*Assoc. Energy Grp., LLC v. United States*
   131 F.4th 1312 (Fed. Cir.2025)………………………………………………………… 12

*BLR Group of America, Inc. v. United States*,
   84 Fed. Cl. 634 (2008)...............................................................................................................13

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) .................................................................................................................18

*FMC Corp. v. United States*,
   3 F.3d 424 (Fed. Cir. 1993) ....................................................................................................11

*Galen Med. Assocs. v. United States*,
   369 F.3d 1324 (Fed. Cir. 2004).................................................................................................13

*Hosp. Klean of Texas, Inc. v. United States*,
   65 Fed. Cl. 618 (2005)...............................................................................................................19

*Int'l Equity Invs. v. Opportunity Equity*,
   441 F. Supp. 2d 552 (S.D.N.Y. 2006)......................................................................................19

*Iron Bow Techs., LLC v. United States*,
   136 Fed. Cl. 519 (2018)..............................................................................................................15

*Kao Corp. v. Unilever U.S., Inc.*,
   441 F.3d 963 (Fed. Cir. 2006) ..................................................................................................13

*Lermer Germany GmbH v. Lermer Corp.*,
   94 F.3d 1575 (Fed. Cir. 1996) ..................................................................................................10

*Minor Metals, Inc. v United States*,
   38 Fed. Cl. 379.................................................................................................................13

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ........................................................................................................10

*Per Aarsleff A/S v. United States,*
   123 Fed. Cl. 147 (2015)...................................................................................................11

*PGBA, LLC v. United States*,
   389 F.3d 1219 (Fed. Cir. 2004)............................................................................. 10, 11, 12

*Serco, Inc. v. United States*,
   101 Fed. Cl. 717 (2011)...................................................................................................19

*Silfab Solar, Inc. v. United States*,
   892 F.3d 1340 (Fed. Cir. 2018).......................................................................................10

*SMC Corp., Ltd. v. Lockjaw, LLC*,
   481 F. Supp. 2d 918 (N.D. Ill. 2007) ..............................................................................19

*SmithKline Beecham Corp. v. Apotex Corp.*,
   439 F.3d 1312 (Fed. Cir. 2006)........................................................................................13

*Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
   840 F. Supp. 2d 327 (D.D.C. 2012) ................................................................................11

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)............................................................................................... 10, 12, 18

*Zenith Radio Corp. v. United States*,
   710 F.2d 806 (Fed. Cir. 1983) .........................................................................................13

## STATUTE

28 U.S.C. § 1491(b)(3)............................................................................................................15

## RULE

RCFC 65(c)..............................................................................................................................19

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| WAVE DIGITAL ASSETS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| COMMAND SERVICES & | ) |
| SUPPORT, INC., | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

No. 25-928 C

(Judge Tapp)

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

Defendant, the United States, respectfully responds to the motion for preliminary injunction filed by plaintiff, Wave Digital Assets, LLC (Wave), ECF No. 7 (Pl. Mot.). Wave has not, and cannot demonstrate, that it is entitled to the extraordinary relief of a preliminary injunction; its motion should therefore be denied. In this brief, we rely on the complaint, and an appendix comprised of a preliminary limited administrative record and sworn declarations[1] from ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ .

---

[1] The United States submits these declarations to address the significant harm to Class 2-4 cryptocurrency seizure and forfeiture operational interests that would result if the Court were to enjoin the awardee, defendant-intervenor, from continued performance and, in such a circumstance, the appropriate amount of the bond required by Rule 65(c) of the Rules of the United States Court of Federal Claims (RCFC). *See, e.g., AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 366-67 (2009) ("In general, it is appropriate to add evidence pertaining to prejudice and the factors governing injunctive relief to the record in a bid protest—not as a supplement to the AR, but as part of this Court's record.").

████████████████████████████

## INTRODUCTION

The mission of the Department of Justice (DOJ), United States Marshals Service (USMS), is to "enforce federal laws and provide support to virtually all elements of the federal justice system . . .[to include] seizing assets gained by illegal means and providing for the custody, management, and disposal of forfeited assets." https://www.usmarshals.gov/who-we-are. The DOJ Asset Forfeiture Program (Program) was "created in 1984 when Congress passed the Comprehensive Crime Control Act, which provided federal prosecutors and agents the legal and regulatory tools necessary to keep up with, and ahead of those who commit crime for economic benefit." https://www.usmarshals.gov/what-we-do/asset-forfeiture. The "Program's mission is to use asset forfeiture as a tool to deter, disrupt and dismantle criminal enterprises by depriving criminals of the instruments of illicit activity." https://www.usmarshals.gov/what-we-do/asset-forfeiture/fact-sheet. This includes the seizure/forfeiture of an unregulated, highly complex, obscure and ever-evolving portfolio of cryptocurrencies known as Class 2–4 cryptocurrencies. These cryptocurrencies require specialized IT infrastructure and technical expertise that the USMS does not have the ability to self-manage.[2]

---

[2] The agency issued a separate solicitation for Class 1 cryptocurrencies. The PWS classifies Class 1 as "[c]ryptocurrencies that are supported by cold storage wallets and can be liquidated on most exchange platforms (e.g., Bitcoin, Ethereum, Litecoin, Tether)." Attach. F at. 3. Class 2 is defined as "[c]ryptocurrencies that are supported by cold storage wallets but cannot be liquidated on most exchange platforms. Cryptocurrency must be swapped for a supported cryptocurrency type prior to liquidation (e.g., Bitcoin Gold, Fantom, Tron, etc.)." *Id.* Class 3 is defined as "[c]ryptocurrencies that are not supported by cold storage wallets but can be liquidated on most exchange platforms (e.g., Celo Gold, Mirror Protocol, BOBA Token, etc.)." *Id.* at 4. Class 4 is defined as "[c]ryptocurrencies that are not supported by cold storage wallets and cannot be liquidated on most exchange platforms. These cryptocurrencies typically require coin/token specific software for custody and transacting. Cryptocurrency must be swapped for a supported cryptocurrency type prior to liquidation (e.g., Ark, Bitcoin SV, Ravencoin, etc.)." *Id.*

2

████████████████████████████

The bid protest filed by Wave challenges the single award indefinite delivery indefinite quantity contract (IDIQ) to defendant-intervenor, Command Services & Support, Inc. (CDMSS) to provide the necessary expertise and capability that USMS lacks specifically for the seizure/forfeiture of this unique portfolio of Class 2-4 cryptocurrencies.  In its motion, Wave raises substantially similar, if not the same, protest grounds that were repeatedly rejected during proceedings before the agency and the Government Accountability Office (GAO).  As such, Wave is not likely to succeed on the merits.

Moreover, the balance of the harms weighs against injunctive relief.  Wave will not suffer irreparable harm if performance is allowed to move forward while this protest is litigated.  Wave does not offer any evidence of irreparable harm and only relies on the arguments of counsel.  Its unsupported and undeveloped argument is thereby waived.  Indeed, the status quo for the past six months while performance has been ongoing has shown that Wave has not been harmed at all – let alone irreparably harmed – as Wave still appears to be in business.  On the other hand, as set forth in the two declarations provided by the USMS, the United States will suffer significant programmatic and economic harm if this Court issues injunctive relief.  In addition, the USMS will incur millions of dollars in unnecessary costs if it must pause the currently-ongoing work six months into performance and restart it later.  The law enforcement and economic benefits that will result from performance of this contract are significant.

Ultimately, this Court must deny preliminary injunctive relief.  Alternatively, if the Court grants Wave preliminary injunctive relief, the Court should order Wave to post a bond of $927,703.25 per month in accordance with Rule 65(c).  *See* Decl. ████. ¶ 12.

██████████████████████████████

### QUESTIONS PRESENTED

1.       Whether Wave has demonstrated a likelihood that it will succeed on the merits where Wave cannot establish prejudice given its proposal was technically unacceptable making it ineligible for award.

2.       Whether Wave demonstrated that it will suffer irreparable harm in the absence of preliminary injunctive relief when Wave could still be awarded the full contract at issue if it is ultimately successful on the merits irrespective of whether the Court enjoins performance of the contract now.

3.       Whether Wave demonstrated that its harm resulting from a preliminary injunction outweighs USMS's harm where an injunction will cause significant risk to the asset forfeiture law enforcement interests of the United States of not being able to procure services in a timely manner.

4.       Whether Wave has demonstrated that injunctive relief would not be contrary to the public interest where Wave fails to articulate any argument specific to this case and the denial of injunctive relief would result in greater public safety.

5.       The amount of the bond that Wave must post if the Court were to grant its motion, when USMS calculates that delayed performance, in additional to posing significant risks to economic security and law enforcement operations, will lead to an unrecoverable financial harm to United States taxpayers totaling at least $927,703.25 each month.

### STATEMENT OF THE CASE

I.       **Nature Of The Case**

Wave protests the award of a firmed-fixed price contract by USMS to CMDSS under request for proposal No. 15M50024QA4400003 (Solicitation) for the management, storage, and

4

disposal of seized/forfeited Class 2–4 cryptocurrencies. The contract was for one base year and four, one-year options, for $23,076,450. Under a best-value tradeoff evaluation where non-factors were significantly more important than price, among the two proposals that were considered technically acceptable, the contracting officer awarded the contract to CMDSS as offering the technically superior and lower priced offer. Wave's proposal was rated as technically unacceptable and ineligible for award.

Prior to filings its compliant with this Court, Wave filed a protest with the agency and GAO that raised substantially the same challenges before this Court. Attachs. C-D. Wave alleged that CMDSS and ██████████████ were technically unacceptable because they did not have required licenses and registrations to perform the contract, that its own proposal was misevaluated, organizational conflicts of interest due to the employment of a former USMS employee by one of CMDSS's subcontractors, and unequal treatment. All of Wave's challenges were denied by both the agency and GAO. Attachs. C-D.

In its complaint, Wave raises six counts that allege the USMS applied unstated evaluation criteria, inconsistently or unreasonably applied evaluation to its proposal and that of CMDSS and ████, did not meaningfully engage in discussions, and failed to consider an organizational conflict of interest within CMDSS's proposal.

Ultimately, Wave is unable to establish prejudice and therefore will not likely succeed on the merits of its protest. Nor can it demonstrate any irreparable harm when weighed against the significant harm to the agency and the public interest.

## II.    Statement Of Facts

### A.    Government Requirement And Solicitation

On April 5, 2024, the USMS issued a request for proposals (RFP or solicitation) for Classes 2-4. Cryptocurrency Management and Disposal Services as a 100% small business set-aside under FAR Part 12 - Acquisition of Commercial Products and Commercial Services. AR Tab 1 – RFP. The solicitation contemplated issuing a firm fixed priced, single award, indefinite delivery indefinite quantity (IDIQ) contract for a base period of one year and four, one-year options.

The purpose of the contract "is to provide the full range of cryptocurrency custody, management, disposal, and consulting services that are in line with industry standards. This includes but is not limited to such activities as accounting, customer management, audit compliance, wallet creation and management, private encryption key generation and management, backup, and recovery of private encryption key material." Attach. F, Performance Work Statement (PWS) at 3–26. The agency stated that the potential cryptocurrency portfolio that would be transitioned to the contractor upon contract execution was 200 assets with a market value of $77.1 million. *Id.* at 4.

### B.    The Evaluation Factors

The solicitation called for a best value tradeoff of four factors for which offers were to submit proposals in four corresponding volumes: Factor 1 – Experience/Oral Presentation, Factor 2 – Technical Capability/Resumes, Factor 3 –Other Data, and Factor 4 – Price. Attach. G. Offerors were informed that the "contract will be awarded to the responsible company whose proposal conforming to the solicitation will be most advantageous to the government, based on the evaluation of Experience, Technical Capability/Resumes and Price and an approved Teaming

6

Agreement, if applicable, in addition to a compliant Quality Control Plan (QCP). **All non-price factors, when combined, are significantly more important than price.**" *Id.* at 1 (emphasis in original).

Factor 1 – Experience/Oral Presentation (Volume 1) was broken into three subfactors (A) the oral presentation; (B) the demonstration; and (C) on-the-spot questions. In subfactor A, offerors were to give an oral presentation providing responses to a list of thirteen questions provided in the RFP. For subfactor B, offerors were to provide a demonstration of the offeror's understanding and capability to offer/create a solution for the USMS based on the PWS and respond to an additional eight questions. In subfactor C, offerors were to respond to two "on-the-spot" questions presented at the time of the oral presentation. *Id.* at 5–7.

For Factor 2 – Technical Capability/Resumes (Volume 2), offerors were to address in writing the following five subfactors: 1) Facility and Staffing, 2) Initial Intake, 3) Storage and Management, 4) Disposal and 5) Resumes. *Id.* at 9–11.

For Factor 3 – Other Data (Volume 3), offerors were to provide the following: 1) signed Standard Forms 1449 and 33, 2) proof of commercial crime and cyber insurance or capability of obtaining the same, 3) Organizational Conflict of Interest certification, 4) Exceptions/Deviations/Conditional Assumptions, 5) Quality Control Plan (QCP), and 6) Teaming Agreement (if applicable). *Id.* at 11–13.

Lastly, for Factor 4 – Pricing (Volume 4), offerors were required to submit an original price schedule stating fixed prices for specified bands of transactions in accordance with RFP Attach. G. *Id.* at 12–13.

████████████████████

## C.    The Evaluation and Award

Of the ten vendors that timely submitted proposals, three vendors (CMDSS, Wave and ████) advanced to Phase 2 of the procurement.   After the Technical Evaluation Board (TEB) evaluated proposals, the Contracting Officer (CO) opened discussions on June 26, 2024.  The TEB then reevaluated proposals based upon the results of discussions and the CO determined that an additional round of discussions was required.  Discussions were concluded on October 25, 2024.  Attachs. C-D.

The table below sets forth the results of the Agency's evaluation of proposals.

| Offeror | Factor 1 – Oral Presentation / Experience | Factor 2 – Technical Capability / Resumes | Factor 3 – Other Data | Factor 4 - Price | Overall Technical Rating |
|---|---|---|---|---|---|
| ████ | Some Confidence | Some Confidence | Compliant | $30,213,140.50 | Some Confidence |
| CMDSS | Some Confidence | Some Confidence | Compliant | $23,076,450.00 | Some Confidence |
| Wave | Some Confidence | Low Confidence | Compliant | $19,746,500.00 | Low Confidence  Technically Unacceptable for Award |

Based upon her review of the proposals and the TEB s report, the CO awarded the contract to CMDSS rather than ████ on a best value basis, finding that CMDSS was the technically superior and lower priced offer among the two proposals that were technically acceptable. Attach. C.

On October 29, 2024, the USMS awarded the contract to CMDSS and notified Wave of its unsuccessful offer.  The agency provided Wave a post-award debriefing on November 1, 2024, that included the TEB's evaluation of Wave's proposal as technically unacceptable. Attach. E.

████████████████████████

#### D.    Agency Protests

On November 8, 2024, Wave submitted an agency protest alleging that 1) CMDSS was ineligible for award because it did not have the required licenses and registrations to perform the contract; 2) the USMS improperly disregarded Wave's assurances that its subcontractor, ████, supported all the Class 2-4 cryptocurrency assets required by the solicitation; and, 3) the USMS misevaluated its proposal based upon a misunderstanding of Wave's proposed relationship with its subcontractors.  Attach. D.

On November 21, 2024, Wave submitted a supplemental agency protest ground alleging that CMDSS had an organizational conflict of interest due to the employment of former USMS employee by one of its subcontractors.  *Id.*  The USMS denied the agency protests on November 26, 2024.  *Id.*

#### E.    GAO Protest

On December 6, 2024, Wave filed its protest at the GAO.  Attach. C.  Wave asserted two protest grounds.  *Id.*  First, Wave alleged the agency deviated from the evaluation criteria stated in the solicitation when it did not determine the proposals of CMDSS and ████ to be technically unacceptable for failing to provide evidence of licensing with the Securities and Exchange Commission (SEC) and FINRA.  *Id.*  Second, Wave claimed the agency failed to properly investigate a potential organizational conflict of interest (OCI) involving a former USMS employee currently employed by a subcontractor to CMDSS.  *Id.*

On February 3, 2025, Wave filed a supplemental protest alleging the USMS engaged in unequal evaluations of the proposals of ████ (the second in line for award that presented a technically acceptable proposal) and Wave with regards to ████'s ability to support Class 2-4 cryptocurrencies.  *Id.*

9

On March 14, 2025, GAO issued its decision denying the protest in whole. *Id.* The GAO determined that the agency's evaluation was reasonable and consistent with the terms of the Solicitation. *Id.*

Due to Wave's untimely GAO protest, there was no automatic stay of performance under the Competition In Contracting Act, 31 USC § 3553. As such, the awardee, CMDSS, has been performing under the contract since the USMS lifted the stay of performance in December 2024.

On May 30, 2025, Wave filed its bid protest.

## ARGUMENT

### I.    Standards Of Review

A preliminary injunction is a "drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). *Accord Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018). Because the grant of an injunction is "extraordinary relief," the Court applies "exacting standards." *Lermer Germany GmbH v. Lermer Corp.*, 94 F.3d 1575, 1577 (Fed. Cir. 1996). Injunctive relief "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In deciding whether to grant injunctive relief, the Court considers:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). The standard for a preliminary injunction is the same, "with the exception that the plaintiff must show a likelihood

10

███████████████

of success on the merits rather than actual success." *Id.* (quoting *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987).

Failure to meet the criteria of any factor may require denial of the request for preliminary relief. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). The Court of Appeals for the Federal Circuit has clarified that a plaintiff *cannot* be granted a preliminary injunction "unless it establishes *both* of the first two factors, *i.e.,* likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350 (Fed. Cir. 2001) (emphasis in original); *accord Per Aarsleff A/S v. United States,* 123 Fed. Cl. 147, 156-57 (2015).

## II.    Wave Is Not Likely To Succeed On The Merits

In its motion, the bulk of which addresses the merits, Wave alleges the agency's actions were arbitrary, irrational, and contrary to law on six grounds: (1) deviation from solicitation terms related to unsupported cryptocurrency; (2) failure to give sufficient time to respond to discussions; (3) unequal treatment with ███'s proposal; (4) self-contradictory evaluation of Wave's proposal; (5) deviation from stated evaluation criteria regarding licensing; and (5) conflict of interest within CMDSS's proposal. Pl. Mot. at 8–19.

As the agency and GAO decisions demonstrate, however, Wave's protests grounds have largely been already examined and denied. Attachs. C-D. As such, it is unlikely that Wave's third attempt to raise its protests grounds will prove successful. Specifically, GAO concluded that the agency's evaluation was reasonable and consistent with the terms of the solicitation. It also determined that Wave's protest "improperly seeks to transform various solicitation provisions into unstated evaluation factors." Attach. C at 7. More specifically, it found that compliance with applicable laws and regulations for a contractor to perform were matters of

11

contract administration and therefore improper for Wave to challenge. *Id.* It further denied its unequal treatment challenge because Wave could not demonstrate prejudice. *Id.* at 8. GAO also considered evidence presented by the USMS that directly contradicted Wave's OCI allegations. *Id.* at 5–6 n.13, which had also been addressed and denied during Wave's agency level protest. Attach. D at 5. Ultimately, even if there were any errors, Wave must show that it was "significantly prejudiced" by those errors to succeed on the merits. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005). To establish significant prejudice, the protester must show that "there was a 'substantial chance' it would have received the contract award but for the [agency's] errors in the bid process." *Id.* at 1358 (citations omitted); *see also Assoc. Energy Grp., LLC v. United States,* 131 F.4th 1312 (Fed. Cir.2025), *Glenn Def. Marine (ASIA), PTE Ltd. v. United States,* 720 F.3d 901, 912 (Fed. Cir. 2013). Having not even proposed a technically acceptable proposal solution eligible for award or demonstrated its ability to correct material deficiencies within its proposal, Wave will likely not be able to best the technically acceptable proposals submitted by CMDSS and ▮▮▮. Accordingly, Wave's protest grounds will prove meritless and the Government preserves our right to challenge those grounds further based on the briefing schedule agreed upon by the parties, ECF No. 24.

## III.   Wave Has Failed To Demonstrate It Will Suffer Irreparable Harm Absent Preliminary Injunctive Relief

Wave has failed to carry its burden to establish that it will suffer irreparable harm in the absence of preliminary injunctive relief during the pendency of this protest. *E.g., Amazon.com,* 239 F.3d at 1350. "The irreparable injury requirement erects a very high bar for a movant." *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.,* 840 F. Supp. 2d 327, 334 (D.D.C. 2012) (citation omitted). To obtain preliminary injunctive relief, it is not sufficient that a plaintiff demonstrate the mere "possibility" of irreparable injury – rather, it must "demonstrate that

irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

As an initial matter, the procedural posture of this case belies the needs for immediate relief. It has been nearly eight months since USMS awarded the contract to CMDSS in October 2024. And, CDMSS has been performing since December 6, 2024 after the stay was lifted following the agency protest. Wave did not timely file a GAO protest and, thus, did not obtain an automatic CICA stay. Wave chose not to file a protest at this Court to seek a preliminary injunction at that time. And after the GAO issued its March 14, 2025, decision denying all of its protest grounds, Wave waited nearly two months to file its complaint and motion for preliminary injunction. Meanwhile, the awardee, CMDSS has been providing the critical services required under the contract for over six months. Wave's lackadaisical approach to seeking a stay or preliminary injunction should itself demonstrate that there is truly no irreparable harm that would require the extraordinary relief it seeks.

Moreover, Wave has not offered any evidence of irreparable harm, except for argument of its counsel, which is fatal to its request for injunctive relief. *See Winter*, 555 U.S. at 21–22 (vacating preliminary injunction that was based upon a mere "possibility" of irreparable harm because the movant must "demonstrate that irreparable injury is *likely* in the absence of an injunction") (emphasis in original); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544-45 (1987) (vacating preliminary injunction in part because the court of appeals had incorrectly presumed the existence of irreparable harm); *PGBA*, 389 F.3d at 1231-32 (affirming denial of preliminary injunction when protestor "did not come forward with evidence it would suffer irreparable harm, such as evidence of lost profits or evidence that a monetary award would not remedy its damages if a resolicitation or reevaluation was not ordered"); *OAO Corp.*, 49 Fed. Cl. at 480 ("Mere allegations of an unfair competitive bidding process are not sufficient to

13

demonstrate an irreparable injury," because "if they were, any bid protest would involve an irreparable injury."). Notably, Wave did not submit any declarations to support its allegations of irreparable harm. Simply put, argument of counsel is not evidence. *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1339 (Fed. Cir. 2004); *BLR Group of America, Inc. v. United States*, 84 Fed. Cl. 634, 648 n.17 (2008) ("The court cannot accept attorney argument as fact.") (citations omitted)).

Moreover, any harm that Wave might allege in its reply would be waived. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (concluding that an insufficiently developed argument was waived); *see also Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 973 n.4 (Fed. Cir. 2006) (concluding that a litigant waived an argument by failing to adequately address it in the "argument section" of its brief). Without identifying any specific harm, Wave generally states that "[a]bsent a preliminary injunction, Wave will naturally suffer irreparable harm. Continuing performance of the Contract will mean less work for Wave when an award is correctly made to Wave. This necessarily means less profit for Wave." Pl. Mot. at 19. Wave, however, not only fails to present any evidence but does not even attempt to quantify, let alone explain, the alleged lost profits during the pendency of this protest, especially in the context of a five-year procurement. Wave's mere recitation of "less work" means "less profit" "when the award is correctly made to Wave," Pl. Res. at 19, is speculative at best, and "does not rise to the level of irreparable injury." *See Minor Metals, Inc. v United States*, 38 Fed. Cl. 379, 381-83 (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed. Cir. 1983). As such, Wave not only fails to establish irreparable harm, but having not developed the argument at all in its opening brief, has waived it.

14

████████████████████████

## IV.    The Balance Of Harm Favors The Government

Wave's failure to establish irreparable harm alone would be sufficient to deny injunctive relief. However, any irreparable harm that Wave might incur must be balanced against the harm of an injunction to the Government. In its motion, Wave incorrectly argues that the Government will face no harm. Pl. Mot. 20. Its premise for this conclusion is based on "the fact that USMS has been self-performing the work in question for some time" and therefore has the ability to self-manage the seized cryptocurrency. Pl. Mot. 20. That premise is flawed as demonstrated by the very findings in a 2022 Office of Inspector General audit of USMS that Wave relies upon to argue otherwise. Pl. Mot. at 10, 20. As even Wave recognized, that 2022 audit determined that USMS could not self-manage cryptocurrency and therefore sought to outsource the requirement. Pl. Mot. at 10.

Moreover, the policy issue identified in the 2022 audit has since been resolved. Decl. ███ at ¶ 6. As the ████████████████, USMS, Asset Forfeiture Division, who oversaw the corrective actions stemming from the 2022 audit explains:

> Due to improvements made by the USMS in the areas of comprehensive inventory management with systems controls; asset management system enhancements; and greater documentation of standard operating procedures (SOPs); the OIG audit was fully closed in May 2023, after the USMS implemented all seven recommendations. However, the need for industry expertise for the ever-changing asset category remained.

As such, Wave's focus on the White House policy statements "cautioning patience" is misplaced. Nor does it change the fact that USMS cannot self-manage the requirement as Wave incorrectly argues. Pl. Mot. at 20.

Consistent with the 2022 audit and as attested to by those responsible and leading the Program, it is precisely because USMS is unable to self-mange the Class 2–4 cryptocurrency

15



portfolio that USMS sought to outsource this capability to the private sector. Decl. ██ at ¶ 8; Decl. ██ ¶ 8. The Class 2-4 cryptocurrencies "are obscure, complex in nature, and require unique or niche software to simply take custody of and manage that evolves at an alarming rate." Decl. ██ at ¶ 4. As explained by Mr. ██, Class 2-4 cryptocurrencies, "require[ ] specialized infrastructure that USMS ████████████████████████████ to build and support." Decl. ██ at ¶ 4. ████████████████████████████

████████████████████████████

████████████████████████." Decl. ██ at ¶ 8.

As explained above, the "Program's mission is to use asset forfeiture as a tool to deter, disrupt and dismantle criminal enterprises by depriving criminals of the instruments of illicit activity." https://www.usmarshals.gov/what-we-do/asset-forfeiture/fact-sheet. The current procurement is necessary to "combat the most sophisticated criminal actors and organizations – including terrorist financiers, cyber criminals, fraudsters, human traffickers, and transnational drug cartels." Decl. ██ at ¶ 4. Cryptocurrency has been used to engage in crimes and illicit activities such as:

> (1) . . .buying and selling illicit drugs or weapons on the dark web, leasing computer equipment to commit cybercrimes, or soliciting funds to support terrorist activity; (2) engage in money laundering or shield otherwise legitimate activity from tax, reporting, or other legal requirements; or (3) commit crimes directly involving the cryptocurrency marketplace itself, such as stealing cryptocurrency from exchanges through hacking or using the promise of cryptocurrency to defraud unwitting investors.

Decl. ██ at ¶ 4.

In this manner, the effective seizure and forfeiture of Class 2–4 cryptocurrencies is highly relevant to conducting critical law enforcement operations that may even implicate national security. *See Iron Bow Techs., LLC v. United States*, 136 Fed. Cl. 519, 532 (2018) (finding it

16

appropriate to consider "national security interest in preventing foreign interference with the Nation's technologies" in the injunctive relief analysis).[3]

Additionally, an injunction would have a material impact on compensating identifiable victims of crime who have filed claims with the Government, and are awaiting the liquidation of the associated cryptocurrency. As indicated by Ms. ██████, the estimated value of Class 2-4 cryptocurrencies is currently worth ██████ and continues to grow. ██████ Decl. at ¶ 10. An injunction will result in victims of crime, who have been verified by Federal courts and seizing agencies, to go uncompensated at no fault of their own. ██████ Decl. at ¶ 10. The current requirement provides the necessary methods and expertise to ensure targeted funds are not lost due to an inability to effectively store or transfer and liquidate these assets for victim compensation. ██████ Decl. at ¶¶ 5–7, 10.

Moreover, the level of economic harm, programmatic impact and effect on national security is compounded by the fact that USMS serves as the custodial agency for all DOJ seizing agencies to include the Federal Bureau of Investigations, Drug Enforcement Administration, and Bureau of Alcohol Tobacco Firearms and Explosives. These agencies rely on the USMS to "move cryptocurrency assets from subjects' wallets to government-controlled wallets, which is a critical part of the seizure process." ██████ Decl. at ¶¶ 8. The current contract provides the necessary means via "gas" to avoid "delays in the seizure/custody process, and other time-critical operations, ██████████████████████████████████████." ██████ Decl. at ¶ 8. For example, in the past year, the agencies have requested gas to seize or

---

[3] The seizing of cryptocurrency assets has proven to be a disruptor to those that seek to use it to threaten national security. For example, cryptocurrency that was intended to support Hamas terrorist financing was intercepted and seized in March 2025. https://www.justice.gov/opa/pr/justice-department-disrupts-hamas-terrorist-financing-scheme-through-seizure-cryptocurrency

17

████████████████████████████

move all classifications of cryptocurrencies worth ████████. ██ Decl. at ¶ 8. ████

██████████████████████████████████████████████████ Likewise,

the USMS does not have the requisite storage services to ensure consistent security of the assets

and prevent the loss of Class 2–4 cryptocurrencies already seized. The current contract provides

the necessary storage services currently affecting a portfolio of ██████, which continues to

grow. ████ Decl. at ¶ 8. A PI would thereby detrimentally impact seizing agencies across the

Federal government that rely on the USMS to provide gas and storage services.

In addition, an injunction would waste considerable resources already expended to obtain

the requisite Authority to Use (ATU) designation specific to the vendor on this contract. This

designation is required by the USMS to utilize the services of an outside vendor. It expires

annually and is non-transferrable. With a stay lifted since December 2024, CDMSS has obtained

the requisite ATU and pausing this effort now would only waste the considerable progress made

to date. ████ Decl. at ¶ 11.

Lastly, and importantly, an injunction, would directly affect the USMS's ability to

comply with executive orders issued by President Trump as it pertains to digital assets. Decl.

████ at ¶ 10. In line with those order, continued services under the contract are necessary to

promote leadership in digital financial technology and harness the power of digital assets. An

injunction would limit the USMS's efforts causing reputational harm to it and the United States

let alone the underlying economic and programmatic harm. Thus, given the articulated harm to

the United States, including significant risks to economic prosperity and national security, and

the lack of demonstrated harm to Wave, the balance of harm favors the Government. *See Fisher*

*Sand & Gravel*, 143 Fed. Cl. at 254.

18

V.    **A Preliminary Injunction Would Be Contrary To The Public Interest**

Although we recognize that the public interest is served when the integrity of the procurement system is maintained, this factor cannot dominate the analysis of the public interest prong because that would create a categorical rule that presumptively favors an injunction, a presumption which the Supreme Court has rejected. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006). Furthermore, this Court has held that it is in the public interest for "a procuring agency [to] be able to conduct procurements without excessive judicial infringement upon the agency's discretion." *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 242 (1997) (citation omitted).

In determining whether to issue an injunction, the Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citations omitted). The Court should defer to agency officials' "predictive judgments" regarding the potential harm of an injunction. *See id.* at 27.

Here, for the reasons discussed above and in more detail in the declarations provided with this response, the public interest favors a denial of Wave's motion. In particular, pursuant to President Trump's EO, it is in the public interest to "harness, not limit, the power of digital assets for our prosperity," which includes the use of Class 2-4 cryptocurrency for law enforcement operations and returning digital assets to victims of crime. https://www.whitehouse.gov/presidential-actions/2025/03/ establishment-of-the-strategic-bitcoin-reserve-and-united-states-digital-asset-stockpile/.

Finally, it certainly is not in the public interest to stop a critical Federal law enforcement program in its tracks, months after its commencement by an allegedly aggrieved party, who sat

on it rights for nearly half a year and then decided to belatedly come to Court to take a third bite at the procurement protest apple.

Simply put, because an injunction would be contrary to the public interest and the harms faced by the public and USMS outweigh any potential harm faced by Wave. Accordingly, Wave is not entitled to injunctive relief.

## VI.    If The Court Grants A Preliminary Injunction, Wave Should Be Required To Post Bonds In The Amount Of At Least $927,703.25 Per Month

If the Court grants Wave's motion and enjoins USMS from proceeding with performance during the pendency of this bid protest, the Court must require Wave to post a bond. Pursuant to RCFC 65(c), the Court may issue preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Because this bond requirement ensures that the enjoined party is made whole in the event of undue judicial interference, "[c]ourts that do not observe these precautions will sometimes leave wounds [that] the Court of Claims will be in no position to heal." *Hosp. Klean of Texas, Inc. v. United States*, 65 Fed. Cl. 618, 625 (2005) (citation omitted). Such "wounds" can include the "increased costs of performance under [a] bridge contract" during the pendency of the injunction. *Id.*

As the party seeking security, the United States need only establish a "rational basis" for the amount of security. *Int'l Equity Invs. v. Opportunity Equity*, 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006). Consequently, the Court routinely relies on the Government's "estimates of the costs associated with issuing a [temporary restraining order]." *Serco, Inc. v. United States*, 101 Fed. Cl. 717, 722 (2011). The Court "should err on the high side" because setting the security too low might produce injury, since "the damages for an erroneous preliminary



injunction cannot exceed the amount of the bond." *E.g., SMC Corp., Ltd. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 929 (N.D. Ill. 2007) (citation omitted); *cf. Bona Fide*, 96 Fed. Cl. at 243.

As we demonstrate above, any injunction of performance of the Contract risks significant harm to critical cryptocurrency seizure/forfeiture operation objectives of USMS and no bond could possibly provide security against such harms. However, if USMS is forced to halt these services, USMS calculated that, in addition to posing risks to its cryptocurrency Class 2–4 law enforcement activities, delayed availability of the Contract will lead to an unrecoverable financial harm to United States taxpayers totaling an estimated amount of at least $5,566,219.41 for a period of six months or a monthly rate of $927,703.25. Declarant Decl. ▮ at ¶ 12. Accordingly, this Court should require Wave to post a bond that covers at least a three month period based the proposed schedule, ECF No. 24.

### CONCLUSION

For these reasons, the United States respectfully requests that the Court deny Wave's motion for a preliminary injunction. In the alternative, if the Court disagrees and enjoins the USMS from going forward, the Court should order Wave to post a bond that covers at a minimum the monthly rate of $927,703.25 for each month the injunction is in place.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/ Douglas K. Mickle
Acting Deputy Director
*For* ALBERT IARROSI
Assistant Director

21

Of Counsel:
C. JOSEPH CARROLL
Senior Associate General Counsel
U.S. Marshals Service
CG3, 15th Floor
Washington, DC 20530-0001

_s/ Elinor J. Kim_____
ELINOR J. KIM
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel.:      (202) 616-0344
Fax:      (202) 307-0972
E-mail:  Elinor.J.Kim@usdoj.gov

June 13, 2025

*Attorneys for Defendant*

22